# Sullivan *versus* The Commonwealth.

1. The belief of a speedy dissolution is the test by which the competency of dying declarations is to be measured.

2. It is not error to admit evidence showing the condition of the deceased at the time such dying declarations were made.

3. A physician was called as an expert to show the effect of powder marks where a pistol is fired at short range. *Held*, that his testimony, and the cloth or muslin used in his experiments, were admissible in evidence on the trial of a prisoner for murder by means of a pistol. Commonwealth *v.* Quigley, 3 Norris 18, followed.

4. The evidence in this case establishes the essential elements of murder in the first degree.

February 26th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J. absent.

Error to the Court of Oyer and Terminer of *Philadelphia county*: Of January Term 1880, No. 73.

Indictment of Daniel F. Sullivan for the murder of Josephine Irwin.

It appeared at the trial, before Elcock, J., that the defendant Sullivan and the deceased, Josephine Irwin, had been living in illicit intercourse for about four weeks prior to the date of the murder, and occupied the back third-story room of No. 218 South Eighth street, Philadelphia, which room Josephine had rented.

On the night of the murder the prisoner had returned from his work about 5 P. M., and had eaten the supper which the deceased

[Sullivan *v.* Commonwealth.]

had prepared for him. They remained together in their room during the entire evening, with the exception of two visits paid by the deceased to the kitchen in the back building, occupied by two colored women, Ellen Freeman and Nellie Brown. At the last of these visits the deceased was noticed to be crying, and requested Ellen Freeman not to leave the house that evening as she had previously indicated an intention to do.

Between 9.30 and 10 P. M. two reports of a pistol were heard, accompanied with the cries of "murder" and "Frank, you'll shoot me," in a female voice, proceeding from the back third-story room of 218 South Eighth street, followed by the ringing of a bell in the kitchen from the third-story back room, and shortly after by a knock at the door of the room in the back building occupied by Ellen Freeman and Nellie Brown. Upon this door being opened, which led to the main staircase, the prisoner was found on the stairs partly dressed. He requested Ellen Freeman to go for a doctor and a priest, and said, "Josie has shot herself." The deceased, who was then at the top of the stairs, made answer, "Ellen, I didn't—I didn't—Frank Sullivan shot me." The wounded woman was carried in and laid upon her bed, and the colored woman at once left the house for the purpose of procuring a physician and an officer, leaving the deceased and the prisoner in the third-story back room. The prisoner dressed himself hastily, putting his necktie and collar in his pocket and also the pistol with which the deceased had been wounded. He was on his way down the staircase when he was arrested by the police, and brought back into the room where Josephine Irwin lay. When asked by the officer who shot her, she replied, "Frank Sullivan; that's the man that shot me," pointing to the prisoner. Sullivan said nothing in reply. In the presence of Officer Keegan and the prisoner, she said to the prisoner, "Frank, you have done this; you have shot me twice." She repeated this two or three times, the prisoner giving no denial and making no answer. In reply to inquiries by Lieut. Henderson, she said, "That's the man that shot me twice," pointing to the prisoner. Physicians were called, and upon examining the person of the deceased, a wound or scratch was found on the side of the head above the left ear, extending upwards and backwards, and a gunshot wound which penetrated the abdomen and the anterior wall of the stomach, and extended obliquely inwards and upwards, the latter wound being the one which caused her death. A recent bullet mark was found upon the ceiling and south wall of the room, in a line with the position occupied by the deceased, as alleged by the Commonwealth, at the time the first shot was fired, which grazed the left side of the head. From the dying declarations of the deceased, it appeared that the deceased and the prisoner had quarrelled about money, and that upon the prisoner retiring to bed he put out the light, which was usually

[Sullivan *v.* Commonwealth.]

left burning; that the deceased got up and lit the gas, which the prisoner again put out and returned to bed. The deceased got up a second time and was about to relight the gas, when the prisoner fired from the bed where he lay and shot her on the side of the head. She then turned to run towards the door, and in doing so had to pass the foot of the bed, when the prisoner leaned upon his knees across the footboard of the bed, and fired the second shot at her stomach. The pistol found upon his person showed two barrels recently discharged, and was so constructed that it required two movements of the hand to cock and fire it.

One or both of the physicians in attendance remained with the wounded woman until her death, which occurred between 9 and 10 A. M. of the next day. The only medicine administered was a few teaspoonsful of a solution of one grain of sulphate of morphia dissolved in three ounces of whiskey and one ounce of sugar and water, administered at intervals, and some champagne given early in the night to settle her stomach. Very little medicine was administered to her, the physicians relying mainly upon the application of wet cloths to the patient's abdomen. From the first she had a fixed belief that the injury would terminate fatally, and expressed the belief that "nobody gets well that's shot in the stomach," and asked Officer Henderson to send for a priest, that she was "going to die." During the night she was engaged in prayer, and in the morning early directed Ellen Freeman to bring her a box which lay on the bureau, and gave instructions how to dispose of its contents after her death. She was in great pain during the night, and in the morning, shortly before her death, made the dying declarations with reference to the shooting, which were admitted in evidence on the trial.

The defence set up was two-fold. First, that the deceased was accidentally shot by the prisoner; and second, that she committed suicide. It was not pretended that the shot was fired by any third person, or that any third person could have had access to the room where the shooting occurred, as it was clearly shown that the only persons in the dwelling portion of the house, at the time of the shooting, besides the prisoner and the deceased, were the two colored women who were in the back building, and that all the doors communicating with the outside of the house were either bolted or permanently fastened. The theory of accidental shooting was rebutted by the circumstances of the case; and to rebut the allegation of suicide, the Commonwealth showed (as was shown in Quigley's case, 3 Norris 18) that there were no such marks of powder, burning or tattooing upon the person or clothing of the deceased as would necessarily have appeared in case the pistol had been discharged close to the person.

From the character of the weapon, the repetition of the shots, the shifting by the prisoner of his position in order to make the

[Sullivan v. Commonwealth.]

second shot effectual, from the fact that both shots were aimed at vital parts of the body, and from the dying statement of the deceased as to the motive and manner of the shooting, corroborated by the position of the bullet marks on the wall and the testimony of the witnesses residing in the adjoining house, the Commonwealth claimed that the shooting was wilful, deliberate and premediated.

At the trial the Commonwealth called Ellen Freeman to show that the deceased was conscious of her impending dissolution, for the purpose of laying the ground to admit her dying declaration as to the killing. Defendant objected, and objection overruled. (First assignment of error.)

The Commonwealth then proposed to show witness the gown and chemise of the deceased. The defendant objected to any article being shown witness until after examination as to a description of the article. Objection overruled. (Second assignment.)

Dr. Pennington testified, inter alia, as follows, as to the dying declarations of deceased:

"On night of 5th of May I was called on about twenty minutes past ten; I found Josie Irwin in the third story, lying in bed; turned down bed-clothes; discovered wounds to right of middle line and above umbilicus; when I first went into the room, she was throwing herself around on the bed, and breathing very heavily; pulse between 100 to 130; she was very much excited; considerable blood on clothing and bed, but little external hemorrhage; during the night she became easier, pulse ranged from 98 to 140; in the morning much easier; perfectly conscious; pulse 98 to 100; respiration about 20 to a minute, during the night; from the first, she contended she was murdered; she said she knew she had been murdered, and was going to die; that anybody wounded in the stomach never recovered; she was praying frequently during the night, and in the morning, too."

Q. During the night, or in the morning, did she make any statement to you as to how the shooting occurred?

Objected to. Objection overruled.

Ans. "She said she was used to sleeping in the light, and that prisoner wanted the gas turned out, while she wanted it lit, and as fast as one turned it out the other lit it; I believe that's all." (Third assignment.)

Ellen Freeman, as to dying declarations of deceased, was asked: When you were on the stand the other day, you said it was in the morning Josie told you how the shooting occurred. What did she say?

Objected to. Objection overruled.

Ans. "I said, Josie, how did the shooting occur? she said it started about money; she said he said he gave me $25, and he only gave me $10; we contended over it for just a few moments, when she said she got up and went to bed; after so long a time he

read, and then he got ready and went to bed and put out the light, and the light always burned at night, a dim light; she said she watched until he got fixed in the bed, and then she got up and lit it again; and then he leaned over and looked to see if she was asleep, a considerable time after she got in bed; then he got up and put the light out again; she got up to light it, and he shot her in the head; then she said she turned to run toward the door, and he leaned upon his knees across the foot-board, and shot her in the stomach; that's all.'' (Fourth assignment.)

Dr. Butcher testified, inter alia, as follows:

"I am a physician in the county prison; have been there for about twelve years; was assistant surgeon in the army for three years; am familiar with gun-shot wounds; I made experiments with the revolver and cartridges in evidence in this case; I took a piece of muslin and put it on a pillow so as to hold it up, and put it on the wall about four and a half feet high; fired at it with the revolver brought me by Officer Vanzant, and cartridges out of the box he brought me."

Witness here exhibited a white muslin cloth, showing bullet holes and marks numbered respectively from 1 to 11, inclusive, and says:

"No. 1 shows a glance shot fired at the distance of seven feet between the muzzle and the material; it shows only the black mark where the bullet struck, and no marks of powder burning and tatooing; No. 2 was fired at the distance of six inches, and shows blacking at the bullet-hole and tatooing; No. 3 was fired at seven inches, pretty well blackened and tatooing; No. 4 was fired at seven feet, left black around the hole, and no tatooing or powder-mark; No. 5 was fired at five feet, same result as No. 4; Nos. 6 and 7 were fired at seven inches, made black around the hole, tatooing and powder marking; No. 8 was folded; fired at ten feet, made black mark around the holes; No. 9 fired at nine inches, made blacking around hole, tatooing and powder marking; No. 10 was fired at ten inches, made black around the hole, tatooing and powder marking; No. 11 was fired at ten feet, making blacking around the hole. Was surgeon of 99th Pennsylvania regiment; part of the time in field, and part in hospital; was at second Bull Run, Fredericksburg, and other affairs; was surgeon in the hospital; have had gun-shot wounds in my practice, and many of them in prison."

The defendant submitted, inter alia, the following points, to which are appended the answers of the court.

1. Where murder has been committed, and the killing has been done with malice, and not in the perpetration or attempt to perpetrate, any of the crimes enumerated in the Act of Assembly of March 1860, to constitute murder in the first degree, there must have been a deliberate, settled purpose; a disposition of mind leading its victim into murder, aware of its wicked pursuit and intent,

upon the result; and this purpose must be proved according to law, beyond the probability of a doubt; otherwise, the killing is deemed to be murder in the second degree.

Ans. "Affirmed. But the purpose to kill may be inferred from the character of the weapon, the nature and number of the wounds, and from all the circumstances in the case. It is not necessary that the defendant should have avowed a purpose to kill. The law does not require positive proof of an intent. Such intent may be inferred from the act." (Seventh assignment.)

3. If the jury believe the killing was done without malice aforethought, either expressed or implied, upon sudden heat or quarrel, or in any angry altercation, or in consequence of reasonable provocation; or grew out of an assult under circumstances which do not, nor would excuse on the grounds of self-defence, the offence would be manslaughter.

Ans. "Affirmed. But sudden heat or quarrel alone, angry altercation alone, provocation merely, or an assault merely, not excusable on the ground of self-defence, is not sufficient to reduce the offence to manslaughter. To reduce to manslaughter the passion which prompted the killing, must have been aroused by a sudden quarrel upon sufficient provocation, and the parties must contend upon equal terms. No mere words are a sufficient provocation to reduce the offence to manslaughter. There is no evidence in the case of any assault by the deceased upon the prisoner, prior to the shooting." (Eighth assignment.)

6. If the jury believe that the crime was committed by the prisoner without premeditation and deliberation, then he would be guilty of murder in the second degree.

Ans. "Affirmed. But, as I have before stated, the law requires no particular length of time as necessary to form the intention to kill, but leaves the existence of a fully-formed intent, and the consciousness thereof, as a fact for your determination, from all the facts and circumstances of the case." (Ninth assignment.)

7. Whenever death ensues from wounds inflicted in sudden transport of passion or heat of blood; or if, upon reasonable provocation, and without malice, or upon sudden combat, the killing would be manslaughter.

Ans. "Affirmed. There must be not only sudden passion and hot blood, but also sufficient provocation, which must be more than mere words, to reduce the offence, and the parties must contend on something like equal terms." (Tenth assignment.)

8. Under the Pennsylvania statute, a killing with malice, express or implied, the law implies murder in the second degree only; the Commonwealth must show enough malice and wilful deliberation and premeditation, to raise the grade of offence; a failure on the part of the Commonwealth to establish any of these

[Sullivan *v.* Commonwealth.]

points, reduces the offence to murder in the second degree or voluntary manslaughter. (Eleventh assignment.)

Ans. "I have already defined this. The Commonwealth must show a wilful, deliberate and premeditated killing, to convict of murder in the first degree, and this may be proved by circumstantial evidence."

10. The true distinction in all cases like this is, that if death was evidently occasioned by gross, erroneous medical treatment, the original author would not be answerable beyond a verdict of manslaughter.

Ans. "Affirmed. But there is no evidence of gross erroneous medical treatment, and to relieve a defendant on such grounds, the death must be due to that alone. If the alleged shot in any degree contributed to her decease, the defendant is responsible." (Twelfth assignment.)

11. If the jury entertain a reasonable doubt as to the prisoner's guilt, such doubt ought to produce a verdict of not guilty or an acquittal; and this principle is applicable to the different grades of homicide.

Ans. "Affirmed. But it must be a doubt created by the evidence, not one created to avoid responsibility or for fear or favor." (Thirteenth assignment.)

12. If the jury believe that death was the result of an accident, to which the deceased contributed through no fault of the prisoner, then their verdict should be not guilty.

Ans. "That is so, but you must say, if from the evidence in the case, she could have shot herself." (Fourteenth assignment.)

13. If the jury believe that death was the result of an accident through the gross carelessness of the prisoner, then their verdict should be involuntary manslaughter.

Ans. "That is so if there was no intention to shoot; but if the prisoner, knowing the pistol to be loaded, fired two shots at the deceased, the law will presume malice, and the offence would be murder at common law." (Fifteenth assignment.)

None of these assignments were properly made. The points were set forth in one portion of the paper-book, and the answers of the court in another, instead of the answers following the points, as prescribed by this court.

In the general charge the court, Elcock, J., said:

"The prisoner at the bar—so young, yet he, too, so unfortunate—stands indicted for murdering his companion, Josie Irwin, on the night of May 5th last. The Commonwealth's theory briefly is, that these two people, in the evening, had a dispute about a sum of money, and that after going to bed he extinguished the light, when she wished it to burn; that he again extinguished it, and upon arising a second or third time to relight it, he shot her in the head, and as she attempted to escape, or get out of the room, he

[Sullivan *v.* Commonwealth.]

leaned over the foot-board of the bed and shot her in the stomach; that after firing the fatal shot he threw her roughly four times upon the bed, and attempted to escape.

" From this state of facts the Commonwealth's officers ask you to say that there was an intention to take life, and therefore wilful, and that there was a consciousness on the part of the prisoner of the nature and character of the injury inflicted, and of the purpose and design intended, which amounts to deliberation, and as there was sufficient time to enable the mind fully to frame the design to kill, and select the instrument to carry the design into execution, it is premeditation, and murder in the first degree.

" At common law murder is described to be when a person of sound memory and discretion unlawfully kills any reasonable creature in being, and under the peace of the Commonwealth, with malice aforethought, expressed or implied.

" The statute defines murder in the first degree to be any wilful, deliberate and premeditated killing of any human being. And all other murders are murders in the second degree. As these offences have been defined by high authority, there is no use of framing new sentences or language to explain them. Chief Justice Agnew, who gave the clearest and most concise definition of these crimes, says: ' Murder in the second degree includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty; but where no intention to kill exists, or can be reasonably and fully inferred. Therefore, in all cases of murder, if no intention to kill can be inferred or collected from the circumstances, the verdict must be murder in the second degree.'

" Manslaughter is defined to be the unlawful killing of another, without malice expressed or implied, which may be voluntary in a sudden heat, or involuntary, but in the commission of an unlawful act. Voluntary manslaughter often so nearly approaches murder, it is necessary to distinguish it clearly. The difference is this: Manslaughter is never attended by legal malice or depravity of heart—that condition or frame of mind exhibiting wickedness of disposition, recklessness of consequences or cruelty. Being sometimes a wilful act (as the term voluntary denotes), it is necessary that the circumstances should take away every evidence of cool depravity of heart, or wanton cruelty.

" Therefore to reduce an intentional blow, stroke or wounding, resulting in death, to voluntary manslaughter, there must be sufficient cause or provocation, and a state of rage or passion without time to cool, placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed. If any of these be wanting, if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.

"Therefore, if an intention to take life exists, it is wilful. If this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate, and if sufficient time be afforded to enable the mind fully to frame the design to kill and select the instrument, or frame the plan to carry the design into execution, it is premeditated, and is thus murder in the first degree. All unlawful killing, under circumstances of depravity of heart, and a disposition of mind regardless of social duty, but where no intention to kill exists, or can be reasonably and fully inferred, is murder in the second degree.

"Connected with these definitions I may also state that malice, which is one of the essentials of murder, is not a particular ill will, or spite or grudge, but it is a legal term, which comprehends every case where there is wickedness of disposition, badness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty.

"The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully-formed intent as a fact to be determined by you from all the facts and circumstances in evidence.

"It is true that such is the swiftness of human thought, that no time is so short in which a wicked man may not form a design to kill, and frame the means of executing his purpose; yet this suddenness is opposed to premeditation, and you must be well convinced upon the evidence that there was time to deliberate and premeditate. The law regards, and the jury must find, the actual intent; that is to say, the fully-formed purpose to kill, with so much time for deliberation and premeditation as to convince them that the purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has been fully conscious of its own design. If there be time to frame in the mind, fully and consciously, the intention to kill, and to select the weapon or means of death, and to think and know beforehand, though the time be short, the use to be made of it, there is time to deliberate and to premeditate.

"The burden of proof necessary to constitute murder in the first degree, lies on the Commonwealth. But the proof need not be express or positive. It may be inferred from the circumstances, or by circumstantial evidence.

"It may be also stated as a general rule that homicide is presumed to be malicious; that is, murder of some degree, until the contrary appears in evidence. Therefore, the burden of reducing the crime from murder to manslaughter, where it is proved that the person committed the deed, lies on him. He must show all the circumstances of alleviation or excuse upon which he relies to reduce his offence from murder to a milder kind of homicide, unless, indeed, where the facts already in evidence show it. But

[Sullivan *v.* Commonwealth.]

though the homicide, without the circumstances of alleviation or excuse, is presumed to be murder, it is not presumed to be murder in the first degree.    The presumption against him rises no higher than murder in the second degree.    It therefore lies upon the Commonwealth to satisfy the jury of those facts and circumstances which indicate the deliberate intention to kill, and the cool depravity of heart and conscious purpose which constitute, as before stated, murder in the first degree.    When death ensues from the use of a deadly weapon in a quarrel or affray, the jury must scan closely the conduct of both parties, their relation and behavior, and the current of events, the character of the weapon, the manner of its use, and the circumstances attending it; and by a careful survey of the evidence endeavor to arrive at the true motive and cause which prompted the fatal shot.

" Was there provocation, or a cause of provocation ?    Insulting words are not sufficient cause of provocation, nor are actual indignities to the person of a slight and trivial kind, nor disputes about money or about turning out the light.

" To these definitions of the law you must apply the evidence.

" 1. Was the mortal wound inflicted by the pistol in the hands of the prisoner ?    If it was not, that ends the case, and the prisoner should be acquitted.

" 2. If it was, under which of the classifications I have just stated does the evidence constitute the offence ; murder in the first or second degree, or manslaughter ?

" Now, as to the evidence.    No human being saw the shot fired save the poor unfortunate creature who suffered its wound, and the evidence on this point, therefore, is her dying declaration, her declarations in the presence of the prisoner, charging him with her murder, undisputed and unanswered by him at the time.

" The declarations of a person dying from injuries received are admissible in evidence against the prisoner charged with inflicting the injuries, to identify the prisoner and establish the circumstances of the alleged shooting.    The law permits this as a necessity, and because, where a person is conscious of impending immediate death, all temptation to falsehood, either of interest, hope or fear, will be removed, and the awful nature of the situation will be presumed to impress as strongly with the necessity of a strict adherence to truth as the most solemn obligation of an oath administered in a court of justice.

" This dying declaration is, therefore, if properly stated, or repeated by the witnesses on the stand, solemn evidence.    It is, of course, subject to the same rules of criticism or analysis as other evidence.

" The dying declaration is testified to by Ellen Freeman, as follows :  [The court here set forth the evidence of said witness included in the 4th assignment of error.]

[Sullivan *v.* Commonwealth.]

" This is the offence ; is it proved to your satisfaction ?

" Ellen Freeman, it is said, is corroborated by Dr. Pennington, and that the theory is also corroborated by the cry heard by Mr. Hughes and his son, next door, and the scenes witnessed by Mrs. Belisle and Miss Ricourd and Nellie Brown.

" Remember, you are the sole judges of the evidence, its truth or falsity, its weight and connection, and whether it satisfies you of the correctness of the alleged theory as to the cause of death, as well as to all the circumstances of the case, is for you.

" Circumstantial evidence, under which head this evidence is comprised, is, if the links or incidents going to make a complete chain of circumstances be coupled or connected with accuracy, as strong as other evidence, if not stronger. All that the law requires in evidence is, the conviction of the mind as to the existence of a certain state of facts. The only difference between positive and circumstantial evidence is, that the former is more immediate and has fewer links in the chain of connection between the premises and conclusion. One is as liable to perjury as the other. Therefore, if you believe the evidence, and if the chain of circumstances points to a certain conclusion, you have a right to presume the existence of a fact therefrom, as if the circumstances point with unerring accuracy to the conclusion that the prisoner fired the fatal shot you have a right to so presume.

" The prisoner's counsel ask you to infer two theories :

" 1. That the deceased woman caused her own death, either by accident or design. Well, if that is so, of course, there is no murder ; but can you say so, and if so, which theory do you adopt ? Is there any evidence from which you can fairly infer such a state of facts ?

" 2. That the woman died from the effects of maltreatment by the medical attendants. If the shot was fired by the prisoner, and was fatal, it makes no difference as to the treatment. To establish such a defence, the evidence should disclose a state of facts showing the wound was not fatal, but that the treatment alone killed her. But is there any evidence to show that there was maltreatment ? I do not see it.

" In circumstantial evidence, as indeed in positive, the prisoner's guilt must be made out by evidence sufficiently conclusive to exclude any reasonable supposition of his innocence.

" The importance of your duty in determining this evidence cannot be too highly estimated. For the life which has been taken the law requires vindication. If the person be guilty, say so, but if you have a reasonable doubt upon the testimony, an honest, manly one, which appeals to your conscience, not created by fear or favor, the prisoner is entitled to the benefit of it.

" Give the evidence a fair and calm consideration, and let your verdict be such as will satisfy your conscience and the law."

[Sullivan v. Commonwealth.]

The whole of the above charge was assigned for error, and constituted the sixth assignment.

The verdict was murder in the first degree. A motion for a new trial was, after argument, overruled and defendant sentenced to be hanged. He then took this writ, and alleged that the court erred as set forth in the above assignments of error.

*W. H.* and *J. C. Redheffer* and *I. Newton Brown,* for plaintiff in error.—There was no evidence of either a quarrel or previous threats, or anything but the most friendly relations between the parties. The court erred in admitting the testimony of Ellen Freeman as to the dying declarations, when there were two physicians in attendance all the time, and in the absence of the prisoner. The question whether dying declarations are admissible in evidence is exclusively for the consideration of the court.

They should be submitted only on the sole ground that they were made *in extremis.* It was not right that the jury should hear the preliminary grounds for the admission of such declarations. In regard to the articles of clothing admitted in evidence, the defendant should have had the benefit of the witness' knowledge of the articles by her description of them and cross-examination on that knowledge. We do not press the fifth assignment, as we believe the question is set at rest by the ruling in Quigley's Case, 3 Norris 18. As the judge's charge goes up with the record as part of it, and as the court review the record and evidence under the Act of 1870 (Grant *v.* Commonwealth, 21 P. F. Smith 495; Staup *v.* Commonwealth, 24 Id. 458), the defendant will receive the benefit of the court's review. Under the cases of Grant *v.* Commonwealth, *supra,* and Staup *v.* Commonwealth, *supra,* the plaintiff in error assigns in his specifications of error that the verdict of murder in the first degree is against the law and the evidence.

*John R. Read,* Assistant District Attorney, and *Henry S. Hagert,* District Attorney, for the Commonwealth.—The evidence of Ellen Freeman and Dr. Pennington was to show the condition of the wounded woman and her consciousness of impending death, with a view, subsequently, to offer evidence of her dying declarations. It has never been considered essential to the admissibility of such evidence that the prisoner should be present, or that the expressions used by the injured person in relation to his condition or consciousness of death should be made so soon after the transaction as to form a part of the *res gestæ.* Such testimony is introduced to enable the court to form an opinion of the state of mind of the person speaking, and of the view which the speaker entertains of his or her condition. When the court is satisfied, from the testimony of one or more witnesses, that the proper preliminary

proof above indicated has been made, then, and not before, the dying declaration becomes admissible: Rex *v.* John, 1 East P. C. 357; Rex *v.* Welburn, Id. 358; Rex *v.* Hucks, 1 Stark. 424; Rex *v.* Spilsbury, 7 C. & P. 187; Rex *v.* Mosely, 1 M. C. C. 97; Reg. *v.* Peel, 2 F. & F. 21.

It has never been the practice to withdraw the jury when preliminary evidence was being received, and no good reason can be assigned therefor. The Commonwealth was not required to ask the witness to describe the garment referred to by her as worn by the deceased at the time of the shooting, other than as it was described by the term "chemise," before submitting it to her for her inspection and identification. No objection was taken upon the trial to the testimony of Dr. Butcher, the admissibility of such evidence being established by this court in the case of Commonwealth *v.* Quigley, 3 Norris 18, where a similar defence was made upon the trial and a like objection assigned for error. See Rex *v.* St. John Long, 4 C. & P. 398; Paytel's Case, cited in Whart. & Stille's Med. Jur., vol. 2, p. 707. No exception was taken on the trial to the charge of the court, but on the disposition of the rule for a new trial on November 1st 1879, the prisoner's counsel requested the judge to file his charge of record. The charge of the court followed closely the opinion delivered by the late Chief Justice AGNEW in the case of Commonwealth *v.* Drum, 8 P. F. Smith 9, and put the respective theories of the Commonwealth and of the defence fully before the jury for their consideration.

Mr. Justice PAXSON delivered the opinion of the court, May 3d 1880.

Beyond the fact that a human life is at stake, this record presents no question of importance. The principles of law applicable to it are familiar, and do not need elaboration.

The first, third and fourth assignments refer to the admission of the dying declarations of the deceased. We perceive no error in their admission. There was abundant evidence to show that the deceased regarded her wound as mortal from the first, and believed she was going to die. The belief of a speedy dissolution is the test by which the competency of dying declarations is to be measured. Nor was there error in the admission of the evidence showing the deceased's condition at the time the declarations were made.

2. This assignment alleges error in the admission of certain articles of clothing, upon the ground that they were not properly identified. It is wholly unsustained and need not be discussed.

5. There was no error in the admission of Dr. Butcher's testimony, or of the cloth or muslin used in his experiments. He was called as an expert to show the effect of powder marks where a pistol is fired at short range. The testimony may not have been

[Sullivan *v.* Commonwealth.]

very important. I do not think it was. But it was clearly competent. This assignment was not pressed. The competency of such evidence was settled in Quigley *v.* Commonwealth, 3 Norris 18.

6. This assignment alleges error in the charge, which is set forth *in extenso.* There is not a word in the paper-book pointing out what portion of it is objectionable, and as it does not appear to have been excepted to, we may well assume that it contains no serious error. The only reference to it in the printed argument on behalf of the plaintiff is this : "As the judge's charge goes up with the record as part of it, and as the court review the record and evidence under the Act of 1870, the defendants will receive the benefit of the court's review." We find no serious error in the charge.

7th to 15th. These assignments all allege error in the answer to points, and are all improperly assigned. We are not bound to notice them, but in *favorem vitae* will treat them as if they were in proper form. A careful examination of the respective points and the answers of the learned judge thereto, discloses no serious error. The general charge, taken in connection with the answers to points, was a fair presentation of the law of the case to the jury, and furnishes the prisoner no just cause of complaint.

16. This is the general assignment that the verdict was against the law and the evidence. As, however, it was evidently intended to call upon the court to pass upon the evidence, under the Schoeppe Act, we will review it so far as to say that there is abundant testimony to establish the elements of murder in the first degree. When a strong man assaults a defenceless woman in her bed-room with a deadly weapon such as a loaded revolver, and fires not one, but two balls into her body, with deliberate aim, each time at a vital part, the first ball entering her head and the second her stomach, it is idle to say that the case lacks the essential elements of murder of the first degree. The jury may have made a mistake in the degree, but we cannot say so. The evidence was properly before them ; it was their duty to weigh it, and they have performed that duty.

The judgment is affirmed, and it is ordered that the record be remitted to the Oyer and Terminer for the purpose of execution.