## Epperson v. Commonwealth.

(Decided January 18, 1929.)

WAUGH & HOWERTON for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

The defendant, Roy Epperson, was charged with the murder of his wife, Blanche Epperson. He was found guilty of manslaughter and his punishment fixed at confinement in the penitentiary for ten years. About 1:30

on the morning of April 12, 1927, Blanche Epperson was shot with a pistol, from which she died about 20 minutes later. Whether this wound was self-inflicted, or was inflicted by her husband, is a question sharply disputed.

About 1:15 on the morning of April 12th, Nelson Armstrong, a crew caller for the Chesapeake & Ohio Railway Company, by which Roy Epperson was employed, called him by telephone, and a woman's voice answered. Armstrong asked her if Roy Epperson was there, and she replied, "Yes." He asked her if she would call him for the 2:15 train, and she said, "Yes." Armstrong hung up, and aside from Roy Epperson, no one ever spoke to Mrs. Epperson thereafter. About 20 minutes to 2, Roy Epperson called the desk sergeant of the Ashland police force and said to him, "Blanche has shot herself." Immediately thereafter, according to the testimony of Goldie Maggard, a telephone operator, the defendant called for Dr. W. O. Eaton, and she says he was crying and screaming at the time. The defendant claims that he also endeavored to call Mrs. Hiram Pope, his wife's mother, by telephone, but could not get her, so, barefooted and in his nightclothing, he ran to the home of his wife's parents, and waked them and told them what had happened. As he returned to his home, he met policemen Orpin and Justice of the city of Ashland. These officers testified that when they entered the house, they found Mrs. Epperson on the floor, clad only in her nightgown, and that there was a bullet wound in her chest, close to the heart. There was no powder burn on the clothing of the dying woman, nor was there any bullet hole therein. There was no powder burn on her body. The room was in great disorder. The bedclothing was scattered over the floor, some feathers from a pillow were scattered about the room, a catch on the door leading to the dining room had been recently broken off and was lying on the floor. A pistol was discovered on a chifferobe in the room, an umbrella was found which was bent, and there was some other evidence of a struggle. Mrs. Epperson was alive, but was in a moribund condition. There is no evidence that she said a word after the officers got there. She lived about ten minutes. Roy Epperson's account of this is that he was aroused by his wife's effort to wake him, that she had pulled the cover off of him and had slapped and spanked him, and in her efforts to wake him had scratched him on the face. While he was yet half

awake, his wife took from the drawer of the chifferobe a pistol and shot herself. That is about all the evidence there is that directly bears on the question presented.

Roy Epperson now insists that he was entitled to a directed acquittal, but he arrives at that conclusion because his explanation of the matter makes this clearly a case of suicide, so he says. In determining whether a peremptory instruction should be given or not, the question is not, does the weight of the evidence indicate the defendant is innocent? but is there any evidence of his guilt? and here there was some evidence of his guilt. If Roy Epperson had offered no evidence, the evidence offered by the commonwealth would have been sufficient to have sustained the verdict, and if a peremptory instruction is authorized, it is because there is no evidence to sustain a conviction. This woman was dead, and her husband was there with her at the time, and admitted that they had had a sort of tussle in her efforts to awake him, so the court did not err in refusing to direct his acquittal. Nor did the court err in giving an instruction on voluntary manslaughter. He insists that this was either a case of murder or a case of suicide, but instructions must present to the jury every question that is raised by the evidence, and what we have said about evidence of a struggle was sufficient to authorize the giving of a manslaughter instruction.

His next complaint is directed to the action of the court in refusing and admitting evidence. Mrs. Epperson was a woman five feet five inches tall. She was 27 years old, and weighed 325 pounds. She was very sensitive about her age, and her size; talked of it; and Epperson offered evidence to show that; to show that her health was bad, and that she had threatened to commit suicide. This the court improperly excluded. See Wilkerson v. Com., 76 S. W. 359, 25 Ky. Law Rep. 780. The court should not have permitted evidence to be introduced to show that his father-in-law paid his house rent, as that threw no light on the question before the jury. In a search of the premises, the officers found some moonshine whisky in a bottle in the pantry, and the court erroneously permitted that to be proven. We cannot see that that illustrated anything touching defendant's guilt or innocence of his wife's death. The court declined to permit him to say whether or not he loved his wife. This was improper, though we will admit that any

statement he might make on that subject would have but little probative force.

Something over twelve hours after this woman died, the commonwealth's attorney and others made some experiments by trying to bend her arm around to see whether or not it would have been possible for her to have shot herself where she was shot, and the court improperly permitted that evidence to be introduced. The living human body is a wonderful piece of mechanism, and what it can do while living cannot ordinarily be determined by experiments conducted on it when dead. Some measurements were made of her arms in her then cold and stiffened state. The court improperly permitted that to be proven as a part of the efforts of the commonwealth to show this woman could not have shot herself. None of this evidence about the experiments made on this corpse or the measurements of the corpse should have been admitted. The sheriff of the county was introduced, and he was permitted to testify that he had taken a towel and tacked it on a log and had fired into it with Epperson's pistol at a distance of six inches, at a distance of one foot, and at a distance of two feet, and was permitted to exhibit this towel, with powder stains thereon, to the jury. The courts have been very careful about admitting evidence of such experiments. See 22 C. J. sec. 849 et seq., particularly section 852.

In the case of State v. Justus, 11 Or. 178, 8 P. 337, 50 Am. Rep. 470, where a material question was the distance between the muzzle of the gun and the body of the victim of an alleged murderous design, evidence of the result of experiments as to powder marks, made upon pasteboard targets by firing a gun at varying distances, was excluded upon the ground that the human body is fundamentally different in nature and texture from the substances upon which the experiments were made. To the same effect is People v. Solani, 6 Cal. App. 103, 91 P. 654, where white paper was used; McAlpine v. Fidelity & Cas. Co., 134 Minn. 192, 158 N. W. 967, where white paper was used; Morton v. State (Tex. Cr. App.) 71 S. W. 281, where pasteboard was used; Reagan v. State, 84 Tex. Cr. R. 468, 208 S. W. 523, where white paper was used; People v. Fiori, 123 App. Div. 174, 108 N. Y. S. 416, where cloth was used. There is a distinction between the cases just cited, however, and those cases wherein the experiment is made upon cloth, the same or essentially the same as

that worn by the deceased at the time of the shooting, which was then marked or stained by the shooting. For example, see State v. Nowells, 135 Iowa, 53, 109 N. W. 1016; State v. Asbell, 57 Kan. 398, 46 P. 770; Newkirk v. State, 134 Md. 310, 106 A. 694; Beckett v. N. W. M. A. Ass'n, 67 Minn. 298, 69 N. W. 923; Lillie v. State, 72 Neb. 228, 100 N. W. 316; Sullivan v. Com., 93 Pa. 284; Boyd v. State, 14 Lea (Tenn.) 161; Hughes v. State, 126 Tenn. 40, 148 S. W. 543, Ann. Cas. 1913D, 1262; Streight v. State, 62 Tex. Cr. R. 453, 138 S. W. 742; Pollock v. State, 136 Wis. 136, 116 N. W. 851. Interesting efforts to simulate human flesh will be found in State v. Nowells, 135 Iowa, 53, 109 N. W. 1016, where a piece of pork was used, and in Scott v. Homesteaders, 149 Iowa, 541, 129 N. W. 310, where a piece of bacon was used.

Our court has been just as careful as any of the others about admitting these experiments, as will appear from the case of Louisville Ry. Co. v. Hoskins' Adm'rs, 88 S. W. 1087, 28 Ky. Law Rep. 124, wherein about the only difference in the two experiments was that one horse might differ from another in speed, and as the same horse was not used on the two occasions, the result of that experiment was not admitted. It is admitted that this shot passed through no part of Mrs. Epperson's clothing, and the texture of her body is so entirely different from the texture of the towel, upon which the experiments were made, that evidence regarding these experiments should not have been given to the jury. Such experiments, conducted upon pieces of cotton, woolen, linen and silken cloth might give very different results, and different weaves of the same material might give different results. Then how much greater must be the difference in the result of such an experiment conducted on any of these cloths and a similar shot fired into a human body. In order that an experiment shall possess sufficient probative value to warrant the admission of evidence thereof, it is necessary that the circumstances under which the experiment is made shall have been similar to the circumstances prevailing at the time of the occurrence involved in the controversy, and that the materials and instrumentality used shall be substantially the same. A wound made upon a human body by a revolver held directly against it might be very different in appearance from a wound made by the same revolver held two inches, four inches, six inches, or any other distance from

it, and might also differ materially from a wound made by an automatic or a rifle used under the same circumstances. Before this case is tried again, a reading of Scott v. Homesteaders, supra, will be advantageous to the defendant.

Defendant complains of misconduct of the court, and that misconduct consists in this: That during the argument to the jury by Mr. John M. Waugh, counsel for defendant, he said: ''The fact that the defendant went to the telephone and called Dr. W. O. Eaton to come to his home and see his wife and discover the result of her murder while she was yet alive and able to tell how the killing happened is conclusive proof of the truth of his story.'' The attorney for the commonwealth did not object to this argument, but the court interrupted defendant's counsel in the presence of the jury, and stated to him that such argument was not right or legal. This action of the court was very prejudicial to the rights of the defendant, because the argument interrupted was based on facts that had been proven. It was legitimate, and counsel should not have been interrupted so long as the matters being argued were supported by the testimony. Counsel has a right to review the testimony and present it to the jury in varying lights, to comment thereon, and draw all reasonable deductions therefrom. Of course, it may be argued that there was no truth in the statement that Mrs. Epperson was then alive and able to tell how the killing occurred, but there was evidence that she was, and it is for the jury to decide whether or not the evidence is true. Roy Epperson said that his wife told him to get the doctor, that she told him to get her father and mother, and, of course, the jury may not believe it, but it was highly improper, with that evidence in the record, for the court to interrupt the defendant's counsel and stop his argument which he was basing upon it.

His next complaint is directed to what he alleges was misconduct of the attorney for the commonwealth. In his closing argument to the jury, the commonwealth's attorney said: ''The defendant was mad at his wife because his wife had just called to the conductor of his train over the phone and probably said that Roy was drunk and would not go to his work, and was mad at his wife because he was afraid she would cause him to lose his job.'' There is not even an intimation in the evidence to support that statement. His wife had talked to

the crew caller, and according to the evidence of the crew caller, all that was said was he asked her if Roy Epperson was there, and if she would call him for the 2:15 train, and she said she would. There was no evidence, or even intimation of evidence, that his wife had talked to the conductor of the train, that she had said Roy was drunk and would not go to his work, or that Roy was mad at his wife because he was afraid he would lose his job. We have often condemned such action on the part of commonwealth attorneys. In Jamison v. U. S., 7 Ind. T. 661, 104 S. W. 872, the court said: "The court's silence in permitting it to go to the jury from the lips of an officer of the court, whose duty to see that a defendant in a criminal case shall have a fair trial is not less than that of the presiding judge, must necessarily have impressed the jury that the prosecutor's statement of the law was sanctioned by the court." In the case of Clem v. Com., 213 Ky. 265, 280 S. W. 1104, we quoted with approval this, from an earlier opinion: "The commonwealth is not in pursuit of victims, but desires to inflict punishment only in the legal and constitutional way upon the guilty." To permit this argument to be made, over the objection of the defendant, was highly prejudicial.

For the reasons indicated, the judgment is reversed.