## Lee v. Commonwealth.

January 31, 1950.

John B. Rodes, Judge.

Rodes K. Myers, Leland H. Logan and Wilbur O. Bilyeu for appellant.

A. E. Funk, Attorney General, Zeb A. Stewart, Assistant Attorney General, J. T. Orendorf, Commonwealth's Attorney, and Wm. H. Natcher, County Attorney, for appellee.

JUDGE HELM—Reversing.

Appellant, Mrs. Allie Lee, and her mother, Kate Goad, were charged with the murder of appellant's husband, Allie Lee, by placing poison, strychnine, in his food and drink. A severance was requested. The Commonwealth elected to try appellant. Appellant was found guilty and her punishment fixed at life imprisonment.

Appellant assigns as errors: (1) Incompetency of evidence offered by the Commonwealth; (2) refusal of the court to admit testimony that deceased threatened to commit suicide; (3) the court erred in not directing

a verdict of acquittal, and (4) corpus delicti was not established.

Allie Lee, his wife (the appellant), four children, and appellant's mother (Kate Goad), lived on a farm on Hunts Lane in Warren County, about 10½ miles from Bowling Green. On Saturday, August 14, 1948, Lee, his wife, and Jim Croslin, a neighbor, went to Bowling Green. Lee went to get a milk check and Mrs. Lee to get a "hair-do." Lee and Croslin had a fish dinner and drank some whisky. The Lees came home late in the afternoon. About supper time Jim Croslin appeared at the Lee home and was invited to eat with them.

Chester Basham, Coroner of Warren County, was called to the Lee Home about 12:30 a. m., Sunday, August 15, 1948. There he found the dead bodies of Allie Lee, in a side room, and Jim Croslin, in the front room. Rigor mortis had set in. He talked to appellant. She told him they had fried chicken, potatoes, sliced tomatoes, cream gravy, buttermilk and sweet milk for supper; her husband and Croslin drank buttermilk; the rest of them drank sweet milk. She told him that after supper she, her husband and Croslin went to the barn to put the milk in the cooler; that as she stooped over to put the milk in the cooler, Croslin had a half-pint of Calvert whisky; that each of them drank from the bottle and Croslin offered her a drink, which she refused; as they returned to the house, Croslin, at Allie Lee's suggestion, threw the bottle off to the right of the road; they returned to the house and some 35 or 40 minutes after supper her husband became "sick at his stomach"; he told her, " 'I am so sick I could die' "; he went out to the corner of the house and vomited; later Croslin became sick; Lee called for water; when she gave him a dipper of water, instead of drinking it he took the water and poured it on himself; they "would hold their hands up and kinda go backwards, as if in convulsions." Appellant told him that she went to the neighbors' homes trying to get them to call a doctor and to help. Basham stated that at the inquest Mrs. Lee said that for months her husband "wouldn't eat until the rest of the family started eating."

Dr. G. H. Freeman had treated Mrs. Lee for a weak and nervous condition on at least three occasions in 1947, and once in 1948. He prescribed and gave to her

one-fortieth grain strychnine tablets, "something like a dozen at a time." He didn't write a prescription. He doesn't recall whether he told her what the tablets contained.

Dr. W. O. Carson went to the Lee home about one o'clock. Both men were dead. Their bodies, arms, and legs were rigid and immobile. Asked as to the symptoms following the taking of strychnine, the doctor explained that it is absorbed from the stomach and carried by the blood stream to the various organs of the body; the muscles of the stomach contract and become hard, causing vomiting; convulsions follow; the "muscles of the body contract and become hard and stiff and compress the body in the terminal stages and they die from that."

Dr. James H. Martin, drug chemist, Public Service Laboratories, University of Kentucky, a graduate of the Philadelphia College of Pharmacy and connected with the laboratories at Lexington making chemical analyses of drug and food samples for twenty-five years, received a package (a jar) containing the stomach, sections of the liver, and one kidney of Allie Lee. It had a strip of adhesive tape like the doctors use, with the name of "Allie Lee" and "taken at autopsy by W. D. Carson," and had on it, "Taken from Allie Lee at autopsy by Dr. W. O. Carson." He made an analysis of the material received. It "contained the poisonous alkaloid strychnine. * * * about ten milligrams from the stomach contents, * * * 6.8 millegrams from the stomach walls. * * * That didn't represent all the strychnine in the body." The strychnine content represented only "about 1/72 of the body. * * * Strychnine is absorbed by the body. That is the nature of the poison. It's quickly absorbed. * * * It is taken up by the stomach and the circulation of the blood and you will find it in the spinal column, some in the brain, in the liver in large quantities, in the kidneys in a small amount, and in the bones if they have had it very long. * * * After I had tested it in the usual way, to satisfy myself that it really was strychnine, I gave it to a small mouse. The mouse died in eight minutes in typical strychnine convulsions. * * * The typical convulsions start out with the trembling and then a complete spasmodic contraction of the muscles of the chest and arm and legs." The Croslin stomach only con-

tained "about 4½ teaspoonsful of material." He found strychnine there in quantities. He also received a half-pint bottle labelled "Calvert's Reserve" containing a few drops of whisky. The bottle was given serial No. 69051. The adhesive tape affixed to the bottle showed, "Received from Wood Dawson. Found near the home of Allie Lee on August 15, 1948. Coroner, Warren County, Chester Basham," and a postscript "Lee and Croslin were supposed to have drunk from this bottle." He examined the contents of the bottle and found no evidence of poison in the bottle. Dr. Martin found approximately a quarter of a grain of strychnine in the material that he examined. Generally a "half grain is fatal." The contents sent to the laboratory were placed in "our large refrigerator and we kept it under lock and key." The contents were delivered to him by Dr. Brown, director of the laboratory, for examination. The package containing the contents had been delivered to the laboratory by officer Woosley. The contents of the Lee stomach were "tied at each end with a cord and distended with gas." That showed the contents had not been "tampered with."

Dr. Carson stated that doctors, especially the older ones, frequently prescribe strychnine for nervous conditions. The ordinary dosage is 1/40 of a grain. Due to the "danger of poisoning * * * you are always instructed in medical schools * * * never to give dosage larger than 1/40th of a grain." Dr. Carson did an autopsy, removed one kidney, a portion of the liver and the stomach, tied the stomach off with pieces of cord at each end so that nothing could escape, placed them in a half-gallon screw top jar, put a piece of adhesive tape on it, and wrote Lee's name, the date, the doctor's name, that it was taken on autopsy, and what was in the jar. He did a similar autopsy on Croslin's body and delivered each jar to Sergeant Woolsey of the State Police. Dr. Carson was told the findings of Dr. Martin. Dr. Carson gave it as his opinion, from his findings and from the findings of Dr. Martin, that "Allie Lee died of strychnine poisoning."

Sergeant Raymond Woolsey, of the State Police, received a package from Dr. Carson with instructions to deliver it to the laboratories at the University in Lexington. The package was placed in a refrigerator, in a locked room, at the laboratory.

Katherine Lee, 31, wife of Allie Lee, testified: Her mother is Mrs. Kate Goad. She and her husband had four children. The night her husband died, she dressed the chicken, "that is all I did." Her husband and Croslin drank buttermilk. She did not have anything to do with the filling of the glasses of buttermilk. She said she asked Jim "what kind of milk he wanted"; that Jim said " 'I want buttermilk.' " There were "glasses of sweet milk and buttermilk poured out * * *. I handed him the glass of buttermilk. I knew my husband never drinked sweet milk, so I handed him the buttermilk." They finished supper about 8 o'clock. After supper, she took milk to the cooler at the barn; her husband and Croslin went with her. They drank a half-pint bottle of Calvert whisky. She described the sickness and convulsions of her husband, and her attempts to get the neighbors to go for a doctor, the coming of the neighbors to their home, and later the coming of the coroner and Dr. Carson. Dr. Freeman treated her for three months in 1947. He gave her tablets, all of which she took. She did not kill her husband. On cross-examination, she stated that she dressed the chicken out in the yard; her mother prepared the meal; it was ready when she and her husband came in from milking. Her mother drank buttermilk. Dr. Freeman never told her what was in the tablets she took. Asked, "Now, Mrs. Lee, who is this fellow Perdue?" she said, "Well, he's the man that moved us from the Kate Thomas place over to the Joe Hunt place. His initials are H. A. He is married, lives with his wife. His house burned." Asked, "You all had a good many of his things over there at your house, didn't you?" she answered, "We had his farming tools, some of them. * * * We raised pigs on the halves. He left a sow there to raise pigs on the halves." Asked, "Had you ever been together with him alone?" she answered, "Not just to say alone. I haven't been out that way with him as I've been accused." Her husband, when he was drinking, was very jealous of him; he had "threatened to kill him if he ever came back around." Asked as to her husband being slow about starting to eat at her house, she stated that he had since April. Asked why, she answered, "His mother told him that he would have to watch me, that I was going to poison him." The only people there that night were Mrs. Lee, her mother, two small children, Croslin and

her husband. No one got sick "except Croslin and Allie." She cleaned up the dishes. The bottle from which Croslin and Lee drank was a "dark, half-pint bottle," marked "Calvert." As they came to the house her husband told Croslin "to give the bottle a flip. * * * There never was but one whisky bottle found out there" that she knew of. Describing her husband's convulsions, she said, "Yes, it was awful."

Mrs. Kate Goad, 72, stated that she cooked the meal that night. She "fixed" the milk in the glasses. She, Croslin and Lee drank buttermilk; she did not put any poison in the food or milk; Mrs. Lee made the biscuits before the chicken got done frying; she also made the cream gravy. Mrs. Lee made the biscuits and put them in the stove. After Mrs. Lee finished milking, she and Mrs. Lee were back in the kitchen 15 or 20 minutes before they all ate.

Appellant urges that the trial court should not have admitted Dr. Martin's evidence as to his finding strychnine in the parts of the body of Lee taken by Dr. Carson on autopsy and sent to the laboratory at Lexington, because the integrity of this material was not established. We have examined the record carefully as to this, and conclude that this evidence of Dr. Martin was competent.

We find no evidence in the record which would indicate that Lee committed suicide. Mrs. Lee, in her testimony, says that her husband was poisoned. The evidence is convincing that Lee came to his death by poisoning and that strychnine was the agent. It is the theory of the Commonwealth that the strychnine was in the buttermilk which Lee and Croslin drank. It is the defendant's theory that the poison was in the whisky which Lee and Croslin drank.

Appellant says the most incompetent evidence offered by the Commonwealth is the testimony of Dr. Martin relative to the chemical analysis of the contents of the Calvert bottle. The evidence as to the contents of the whisky bottle is vital in this case. Appellant maintains that "there is no testimony which establishes the integrity of the condition of this bottle from the time it was found until the time it was examined by Dr. Martin." Hubert Simpson found the bottle "laying in a bunch of sage grass with the neck up." He delivered

the bottle to Mrs. Sanson at the Lee home. Lige Lee, brother of decedent, received the bottle from Bruce Lee; Lige delivered it to the undertaker, Wood Dawson; Dawson delivered it to the coroner, Basham; Basham delivered it to Woolsey, of the State Police; Woolsey mailed the bottle to the laboratory at Lexington. Bruce Lee, a son of deceased, was absent in the Army at the time of the trial and did not testify, so that there is a break in the chain of evidence as to the bottle, and no one of the witnesses testified that the bottle and its contents were in the same condition when delivered by him as when received by him. We conclude that the integrity of the bottle and its contents was not established by the testimony offered, and that the evidence of Dr. Martin as to his examination of the contents was on that account incompetent.

Appellant offered to show by Pat Murphy that about four weeks before Lee died he said he was going to kill himself. The court did not permit this evidence to go to the jury. In an annotation in 83 A. L. R. 434, it is said: ''In prosecutions for homicide where suicide of the deceased is relied on as a defense, his declarations or threats indicating a suicidal disposition, but not relating to actual attempts, have generally been held admissible for the purpose of showing his state of mind and as tending to support the theory of suicide, at least if the circumstances are as suggestive of suicide as of homicide, and the declarations were uttered within a reasonable time before his death, they being regarded as not within the hearsay rule.''

The facts and circumstances of this case, as shown by the testimony, do not indicate in any way that Lee committed suicide. The trial court properly excluded this evidence. Marcum v. Commonwealth, 308 Ky. 740, 215 S. W. 2d 846; 83 A. L. R. 434 to 439; Epperson v. Commonwealth, 227 Ky. 404, 13 S. W. 2d 247; Wilkerson v. Commonwealth, 76 S. W. 359, 25 Ky. Law Rep. 780.

We believe there was sufficient evidence to take this case to the jury. But because of the error in admission of the testimony of Dr. Martin as to the contents of the whisky bottle, this case is reversed. All other questions are reserved.

The judgment is reversed for proceedings not inconsistent with this opinion.