## LENA MARGARET LILLIE V. STATE OF NEBRASKA.

### FILED JUNE 30, 1904. No. 13,227.

1. **Criminal Law: JURY.** In criminal trials the question of the qualification of a juryman is one of fact for the determination of the trial court, and, unless it appears to be against the weight of the evidence, it will not be overruled by this court.

2. **New Trial.** In capital cases a new trial should not be allowed on account of newly discovered evidence unless its introduction on the trial might have been beneficial to the defendant, and might have led to a different result.

3. **Murder: PROOF OF MOTIVE.** Proof of a motive to commit the crime charged is always competent in murder trials; the fact that the alleged motive is out of proportion to the crime committed does not require that evidence of such motive be excluded. The supposed danger that the jury may give too much weight to the offered evidence is not a legal ground for excluding it.

4. **Trial: EVIDENCE.** When a witness testifies positively to a conversation with an acquaintance over the telephone, an objection to the evidence on the ground that the witness has not sufficiently identified the person with whom the conversation was held should not be sustained, the witness's knowledge of such identity not having been tested by cross-examination or otherwise. The force of the evidence is a question for the jury.

5. **Evidence: USE OF FIREARMS.** In the trial of a defendant charged with the crime of murder with firearms, it is not error to permit evidence that the defendant has for many years been familiar with the use of such firearms.

6. ———: **DISCRETION.** Under some circumstances it is in the discretion of the trial court to permit evidence of experiments to illustrate transactions that have been testified to; and, under the circumstances in this case, the court did not abuse its discretion in permitting such evidence.

7. **Harmless Error.** If, in a criminal trial, evidence is received that is not from its nature necessarily injurious to the defendant, and the receiving of such evidence is not objected to when the same is offered, nor complained of in the petition in error in this court, the error, if any, will be considered to be without prejudice.

8. **Evidence.** In a trial of an information for murder, it is proper to prove the physical conditions existing in the vicinity of the murder at the time the crime was committed. This applies to evidence of finding of unusual articles, as pepper and matches,

upon the floors of the living-rooms of the house where the crime
was committed.

9. ———. In murder trials, it is competent to prove the conduct,
    appearance and actions of the accused immediately after the
    crime was committed, as well as subsequent statements of the
    accused tending to show her connection with the transaction
    being investigated.

10. Instruction. In criminal trials, the previous good character of
    the defendant has great weight as tending to show the improb-
    ability of guilt. The weight to be given such evidence is for the
    jury to determine. The court is not required to tell the jury
    that, if the other evidence is sufficient to satisfy the jury of the
    defendant's guilt, they must still consider whether previous good
    character, when weighed with all the other facts and circum-
    stances in the case, raises a reasonable doubt of guilt.

11. ———. It is not error to instruct the jury that the defendant is
    under no obligations to testify in her own behalf, and that the
    statute expressly declares that her neglect to testify shall not
    create any presumption against her.

12. Trial: Motive. It is not indispensable in criminal trials that a mo-
    tive be shown for the commission of the crime charged. If the
    evidence shows beyond a reasonable doubt that the defendant
    committed the crime, the prosecution does not necessarily fail
    because the real motive for the act cannot be discovered and
    shown to the jury.

13. Instruction: Reasonable Doubt. An instruction that: "A doubt
    produced by an undue sensibility in the mind of any juror in
    view of the consequences of his verdict is not a reasonable
    doubt. And the juror is not allowed to create sources or materials
    of doubt by resorting to trivial or fanciful suppositions and re-
    mote conjectures as to a possible state of facts differing from
    those established by the evidence. You are not at liberty to
    disbelieve as jurors if, from all the evidence, you believe as men.
    Your oath imposes on you no obligation to doubt where no doubt
    would exist if no oath had been administered"—is not to be
    commended in all cases, but in view of the former decision of
    this court in Barney v. State, 49 Neb. 515, we cannot reverse
    the judgment in this case solely on the ground of giving this
    instruction.

14. Circumstantial Evidence. When the evidence relied upon to estab-
    lish the guilt of the defendant is circumstantial, the facts proved
    beyond a reasonable doubt must be such as to exclude every
    reasonable hypothesis inconsistent with the guilt of the defend-
    ant. When the minds of reasonable men might fairly differ as to
    whether there is any reasonable doubt of the defendant's guilt,

Lillie v. State.

the responsibility must be left, where the law places it, with the jury. The evidence in this case, under this rule, supports the verdict and judgment.

15. **Evidence.** In a prosecution for murder committed with firearms, evidence that the defendant had access to a weapon of that nature with which to commit the crime is important, but, if it appears that there was opportunity to conceal such weapon after the crime was committed, such evidence is not indispensable.

ERROR to the district court for Butler county: BENJAMIN F. GOOD, JUDGE. *Affirmed.*

*Matt Miller, C. H. Aldrich, Hamer & Hamer* and *W. V. Allen,* for plaintiff in error.

*Frank N. Prout, Attorney General,* and *Norris Brown,* contra.

SEDGWICK, J.

In the early morning of the 24th day of October, 1902, Harvey Lillie was killed at his home in David City. The circumstances were such that all parties agree that he was wilfully murdered. Lena Margaret Lillie, who was his wife, was charged with the crime, and upon her trial in the district court for Butler county was convicted of murder in the first degree, and sentenced to imprisonment for life. She has brought the record of her conviction to this court for review upon petition in error, and urges that the judgment against her should be reversed because the evidence was circumstantial and was insufficient to justify her conviction, and because of errors in the prosecution against her which prevented a proper investigation of the charge.

1. It is contended that the jury was incompetent; that two of its members, before the jury was impaneled, had formed and expressed opinions as to the guilt of the defendant. In the brief for the defendant, it is said: "The court will grant a new trial because of the prejudgment of a juror, when its attention is challenged to it after ver-

dict, in the same way that it excuses a juror on his *voir dire* examination when the thing was known."

In *Murphey v. State,* 43 Neb. 34, this court said: "Where the evidence by which it is sought to impeach a verdict on account of the prejudice of a single juror, subsequently discovered, is conflicting, an order denying a new trial will not as a rule be disturbed on appeal."

Substantially the same rule was announced in *Clough v. State,* 7 Neb. 320, 347; *Carleton v. State,* 43 Neb. 373; *Hill v. State,* 42 Neb. 503, and in other cases.

In *Bliss v. State,* 117 Wis. 596; 94 N. W. 325, the court said: "The question whether the juryman was disqualified was one of fact for the determination of the trial court, and as such decision does not appear to have been against the weight of the evidence it will not be determined by this court."

When may the evidence be said to be conflicting within the meaning of the decisions of this court? The conflict, of course, must be a substantial one. The evidence must be of such a nature that the presumption of the correctness of the ruling of the trial court is not overcome. The law affords the defendant in criminal prosecution great latitude in the examination of jurors to ascertain whether there are just grounds for challenge. The trial court hears this examination, and will suggest or propound further questions if necessary to ascertain whether the juror is fair and impartial, or may possibly be prejudiced for or against the accused or may have formed or expressed an opinion upon the merits of the questions that are to be tried. The trial court observes the conduct and demeanor of the juror during this examination, and will not hesitate to exercise its discretion and excuse the juror if there is substantial ground to believe that he is for any reason unfit for the service. The rulings of the trial court in the exercise of this discretion will not be disturbed simply because there may seem to be some preponderance of evidence against it. There must be such substantial evidence as to make it appear that in view of all of the evi-

Lillie v. State.

dence bearing upon the matter, and the circumstances sur-
rounding the examination of the juror, the trial court has
abused its discretion in refusing a new trial upon this
ground. In this case, the examination of the juror Car-
lisle is not preserved in full. It is shown by affidavits that
upon that examination the juror stated that he had not
formed or expressed an opinion as to the guilt or inno-
cence of the accused. It is not shown in what connection
that statement was made by the juror nor whether it was
qualified or explained by him. It does not appear that the
defendant might not have discovered the truth as to the
qualifications of this juror by a proper *voir dire* examina-
tion. The evidence as to conflicting statements made by the
juror, out of court, is somewhat indefinite. It is unquali-
fiedly contradicted by affidavits of other witnesses. The
whole evidence is not sufficient to show that the trial
court abused its discretion in overruling this objection.

Two witnesses testified by affidavit that the juror Joseph
Hilger made statements in their hearing some time before
the trial, which would show that he had formed an opinion
as to the guilt of the defendant, and which amounted to an
expression of such opinion. These affidavits are unquali-
fiedly denied by the affidavit of the juror and of Myrtle
Hilger his wife. The conversation, in which the state-
ments are alleged to have been made, was in the presence
of both of the witnesses testifying thereto. The witnesses,
however, do not precisely agree as to the form or sub-
stance of the statement. We find nothing in the record
indicating that the evidence of these witnesses should
prevail against the evidence of the juror and his wife, and
we cannot see that in overruling this objection the trial
court abused its discretion. The affidavit as to the state-
ments of the juror Pool made prior to the trial, does not
show that this juror had formed or expressed an opinion
of defendant's guilt and is wholly insufficient to overcome
the positive statements of the juror's affidavit, and the
presumption of the proper exercise of its discretion on
the part of the trial court.

2. One of the grounds of the defendant's motion for a new trial was that evidence in her favor had been discovered since the trial. Shortly after Mr. Lillie was killed, there was found on a vacant lot in another part of the city a man's shirt alleged to have been marked with blood spots indicating, as it was claimed, that it had been discarded by the murderer to avoid evidences of guilt. This circumstance was known generally by the public, and also by the defendant, long before the trial, and no reason is shown for not having brought this evidence to the attention of the jury, if it might be of any assistance to the defense.

It was not shown in the evidence before the jury that this defendant at the time was in possession of a weapon with which she might have committed the crime. This fact is of importance in connection with the question of the sufficiency of the evidence to sustain the verdict, as will be hereafter noticed. Upon the motion for a new trial on the ground of newly discovered evidence, it was shown by affidavit that sometime after the trial a revolver had been found in an unused well upon premises not far distant from those upon which the murder was committed. Three of the five chambers of this revolver were loaded with bullets at the time it was found, the other two chambers being vacant; and it was claimed that this evidence would indicate that the murderer, in his flight from the premises, had thus disposed of one of the evidences of his guilt. Counter affidavits were filed showing that Mr. Lillie, the deceased, had a similar weapon in his possession sometime prior to the murder. It has been held that in civil cases: "A motion for new trial will not be granted on account of newly-discovered evidence, unless it would be sufficient to render clear what was before doubtful or of so controlling a nature as to probably change the verdict." *Gran v. Houston,* 45 Neb. 813; *Omaha, N. & B. H. R. Co. v. O'Donnell,* 24 Neb. 753; *Hill v. Helman,* 33 Neb. 731.

In capital cases the newly discovered evidence must, at least, be of such a nature as to make it appear that its

introduction upon the trial might have been beneficial to the defendant, and might have led to a different result. The defendant was not arrested until several weeks after the crime was committed, and the finding of this revolver would no more tend to prove that some other party had committed the murder, and had placed it where found, than it would to prove that it was placed there by the defendant herself. No reason has been suggested for supposing that this evidence might have produced a different result in this case.

3. It was proved upon the trial that the defendant had been for several years dealing upon the Chicago board of trade. For some time her ventures had been profitable, so that on the first day of May, about six months prior to the murder, there was a balance with the broker in her favor of $510, but from that time until the death of her husband she was less fortunate. In this short period, her losses amount to more than $1,000, and although the evidence shows that during the entire time of her dealings her net loss was only $100, it appears from the uncontradicted evidence of her broker that she gave him an order on the day before the murder, in which she risked two or three hundred dollars more, and on that day she was notified that it would be necessary for her to "put up" two hundred dollars as the market then stood, and that if it should advance still further three hundred dollars would be required; although the broker had not in fact placed this order, yet, she supposed he had, and understood that she had incurred this loss.

It is contended that this evidence was incompetent, that it tended to prejudice the jury against her and served no legitimate purpose in the case. The same objection is made to receiving in evidence several letters written by the defendant to Mr. Runyon, her broker in the foregoing transactions. One of these letters was written within three or four days after the homicide and the others a little later. In one of these letters, she said:

"That little trade I had there I suppose you took care of

it and I will make it all right some day.   I think it is going to make me some money soon.   They have no way of knowing anything only through you and I beg of you to be careful and what trades on your books that I spoke of are mine and the rest are yours you understand.

"Be careful what you say.   I told them that you never received any margin only through the mail and that the amount was merely inclosed in an envelope and sent. How they know anything is what I can't see, but they don't know much and if you want to ask me anything you can through the mail and it will be safe."

In another letter she said:

"And I will count on you staying by me as you should and you must as they are going to try to make your books a strong point against me and don't let them do it.   They have not one single thing against me and so far they have not been able to dig up anything and do not be the means of such a thing yourself.   I will count on you as a friend to do the right thing by me."

Another letter was as follows:

"Mr. Runyon:

"Remember that you are to stay by me on those books as you agreed to do.   Do all you can for me and do me no harm."

Proof of a motive to commit a crime, is, of course, competent in murder trials.   *Gravely v. State,* 45 Neb. 878; *St. Louis v. State,* 8 Neb. 405.   It is argued in the briefs that it is so improbable that a wife would murder her husband for so small a consideration as to render this evidence wholly incompetent; but it should be improbable that a wife would murder her husband for any consideration, however large; and the fact that the motive shown is out of proportion to the crime committed does not require that the evidence shall be excluded.

Circumstances that tend to show a motive for the crime are to be considered by the jury, and in view of the fact that the defendant knew that Mr. Lillie's life was insured in her favor in something more than seven thou-

sand dollars, it seems proper that this evidence tending to show her disposition to speculate upon the board of trade, and her misfortune, and a special need of money at the time, should be given to the jury as tending to show a motive to commit the crime. It was for the jury to say whether an adequate motive had been shown, and the letters, showing her understanding of the transaction and her great interest in the details thereof, were clearly competent. For the same reason, evidence of her existing indebtedness to the banks at the time was proper to be proved to the jury.

Mrs. Lillie was engaged in dressmaking. She at times employed several girls to assist her in the business. One young lady was engaged with her at this time. The defendant appears to have had some credit with the banks. She occasionally borrowed small sums of money upon her unsecured note. She appears in one instance, at least, to have attempted to deal upon credit on the board of trade. Her statement in her letter to her broker that she would make her "little trade" with him "all right some day," and other circumstances in evidence, would indicate that she had no large amount of ready money. She appears to have been able to procure temporary loans. There is reason to believe from the evidence that she had no means of improving her financial condition permanently other than the earnings of her business, unless it should be from the insurance upon the life of her husband. It was certainly proper that the jury should understand these matters. There is nothing to indicate that the jury gave too much weight to the fact that she had been dealing on the board of trade. The fear that the jury might do so would be no legal ground for excluding evidence otherwise competent and proper.

4. In connection with the evidence in regard to the dealing upon the board of trade, the question arose as to Mr. Lillie's knowledge of these transactions. This was surely a legitimate inquiry. The defendant insisted, and introduced evidence tending to show that these dealings

were in reality with the sanction, and for the benefit of Mr. Lillie, and were carried on in Mrs. Lillie's name, at his request, to avoid objections that his employers might make to his dealing in options while engaged in buying and shipping grain for them. If Mrs. Lillie was not acting for herself in these matters, and was relying upon her husband's judgment to direct her proceedings, it was important that the jury should know the facts. Her broker testified that his instructions from Mrs. Lillie were to not let Mr. Lillie know of her board of trade transactions. The girls of the telephone exchange were called by the state to prove that Mrs. Lillie had, several years before, at the beginning of these transactions requested them not to inform her husband of her talks over the telephone with her broker in carrying her board of trade deals. These speculations seem to have been continuous from the beginning. They were during the whole time largely conducted by conversations over the telephone. If this evidence is to be believed these employees of the telephone company continued under these instructions of secrecy from the time they were given. We see no reason to doubt the materiality of such evidence.

It is further objected that these witnesses did not show themselves competent. The point insisted upon, as we understand counsel, is that the witnesses failed to show that in fact it was Mrs. Lillie with whom they were talking, it appearing that the conversation was over the telephone. No objection, however, was made specifically upon that ground. The witness testified absolutely that she had a conversation with the defendant. No attempt was made to cross-examine, either before or after the evidence was given, as to the witness's means of knowing the identity of the person conversing with her. The evidence was properly submitted to the consideration of the jury.

5. Objection was made to evidence showing that the defendant had for many years been accustomed to the use of firearms, and error is now assigned in overruling this objection. The jury was undoubtedly entitled to know

that fact, and its importance does not appear to have been exaggerated.

6. When Mr. Lillie was killed, there were two shots fired with but a short space of time between them. That the two shots were fired in quick succession is clearly shown by the evidence. One reliable witness, who was walking upon the streets of the town at the time, distinctly heard both of the shots and stated the distance he walked in the time that intervened between them. He was walking in an ordinary way, neither rapidly nor slowly. His evidence by ready computation shows that the time between the two shots must have been not more than eight seconds. It is assumed by both the prosecution and the defense that it was the first shot fired that killed Mr. Lillie, and that the second shot passed through the window glass, and also through the curtain on the inside and the wire screen on the outside of the window, and that both shots were fired by the same person. In determining whether these shots were fired by the defendant or by some other person, it became important to know at what distance from the window the last shot was fired. The curtain, the window and the screen through which the bullet passed were received in evidence, and witnesses for the state testified that they examined these immediately after the shooting and that the curtain was powder-burned. The state then offered evidence of experiments which had been performed for the purpose of illustrating how near the curtain the shot must have been fired to produce such result. This evidence was objected to and its admission is now assigned for error. The character of the curtain is not very clearly shown by the verbal testimony. It is described by some of the witnesses as a lace curtain, and by others it is said to have been made of cotton. The curtain itself was in evidence before the jury. The cloth used in making the experiments is described as common muslin. It is said in the defendant's brief that in making these experiments "the curtain itself was not used, nor a similar one, and was not hung five inches in front of the

original sash, or a similar one, with the wire screen three inches in back of that, similar to the one at the Lillie residence, and with the same gun that Harvey Lillie was murdered with, containing the same cartridges, or similar ones," and for these reasons it is contended that the evidence of the experiments should have been excluded.

In the experiments, the cloth was hung before a wooden surface and about six inches distant; no wire screen was used. It was not known what sort of cartridges were used by the assassin except that one of the bullets which was found in Mr. Lillie's head was in evidence before the jury, and also another similar bullet which was found in a building at some distance from the window and was at least partially identified by the evidence as the bullet fired at the second shot above referred to. It was therefore impossible in these experiments to use the same revolver with which Mr. Lillie was killed, or to be certain of the similarity of the cartridges used. In making these experiments, various revolvers were used of different pattern and of different length of barrel, and cartridges were used of different lengths, being what are called long and short cartridges, and of each length cartridge different kinds were used with reference to the character of the powder with which they were charged; some being filled with common black powder and others with lighter colored or semi-smokeless powder. A record was kept of each shot fired. The cloth used was in evidence before the jury. Each bullet mark through the cloth was fully explained to the jury, showing the kind of revolver and cartridge used in connection therewith, and the distance from which the shot was fired. The distances at which the various shots were fired range from about three inches to about three feet.

In *Davis v. State,* 51 Neb. 301, the court, after pointing out the similarity of the conditions existing in connection with the experiments proved, and the conditions existing in the transactions to explain which the experiments were offered, said:

"This was sufficient to make the evidence competent, and it was for the jury to consider the place where the displacement of the fixtures occurred and the place where the experiment was made and then to give such weight to the testimony of the state's witness who made the experiment as they thought it deserved."

And in *City of Ord v. Nash,* 50 Neb. 335, it was said:

"Some discretion is conferred upon the trial court in receiving evidence of experiments for the purpose of contradicting or corroborating other witnesses, and in order to authorize the reversal of a judgment on account of the admission or rejection of such evidence there must have been a clear abuse of discretion."

The defendant offered evidence of experiments of the same general nature. The experiments complained of were under conditions as closely identical with the conditions of the transactions upon which they were intended to throw light, as the circumstances of the case would admit. The object of the experiments was to explain or illustrate how near a cloth curtain a pistol or revolver must be held in order that a shot fired from it through the curtain will powder-mark the curtain. It is true that it was not shown that any one of these revolvers used in these experiments was identical in construction and power with the weapon with which Mr. Lillie was killed, but there is evidence tending to show that the weapon from which the fatal shot was fired was an ordinary revolver. The defendant, in statements made immediately after the transaction, partially described the weapon, which she says she saw in the hands of the assassin.

We think the circumstances were such as to come within the above rule, and it was not an abuse of discretion on the part of the trial court to admit this evidence.

7. It is contended in the briefs that the court should not have allowed evidence that the sheriff organized a posse in the morning after the murder "with which he prospected the roads and streets, searched the alleys and questionable places, as well as the fields, without discovering a

questionable character, as he claims." When this evidence
was first given no objection was made, and after the gen-
eral statement had been made by the witness without ob-
jection and the witness was questioned further, the tech-
nical objection was made to the witness telling what they
arranged to do, but no objection appears to have beer.
made to evidence of what was actually done in that re-
gard.  There is no assignment in the petition in error
raising this question.  The defendant would certainly
have a right to consent to the admission of such evidence
as this, which might by some be regarded as likely to in-
fluence the minds of the jury favorably to the defendant,
and having consented to its introduction cannot now
predicate error in its admission.

8. Evidence was allowed that pepper was found
sprinkled upon the floor at the foot of the stairway,
matches and a "shoe-heel" were also found upon the floor
of one of the lower rooms.  It is said that it was error to
receive such evidence.  But it is certainly proper to show
the conditions existing in the vicinity of the crime at
the time.  This evidence was directed to conditions ob-
served so soon after the murder as to make its admission
proper.

9. When the defendant first went downstairs with the
girls after the murder, she went to the telephone and when
the witness Hall arrived a few minutes later she was also
at the telephone.  She stated that she was trying to call
assistance, but was unable to get any answer to her calls
from the central office.  The person in charge of the
central office testified that no call was made, that he
would have heard it if any had been made, as he had been
aroused by another call shortly before five o'clock.  It is
urged that it was error to admit this evidence; that it
was prejudicial as tending to create the impression with
the jury that she was simulating and trying to hide ap-
pearances of guilt; but the evidence of defendant's actions
at the time was competent as part of the *res gestæ,* and
there was evidence supporting the defendant's theory that

19

she was unable to call the central office. One witness testified that he was sent to the central office to arouse the persons in charge and was for some time unable to do so. It was proper that the jury should consider all the testimony upon this point.

10. The court was asked to instruct the jury that "if, from all the other evidence, the jury would be satisfied of the guilt of the defendant they must still determine whether or not her previous good character, when weighed with all the other facts and circumstances in the case, raises a reasonable doubt as to her guilt; and, if such reasonable doubt remains, the jury must acquit," and it is insisted that it was error to refuse this request. There was ample evidence of defendant's previous good character. She ought to have the full benefit of that fact. We agree with her counsel that:

"Mrs. Lillie, having been put on trial for murder, had a right to have the jury know that she had an exceptionally high character; that her life had been pure and that she was devoted to the well being and happiness of her husband; and this being shown the jury had a right to say that it did in their judgment not only raise a reasonable doubt of her guilt but that her character was so strong they preferred under the solemnity of their oaths to believe she did not commit the crime."

Judge Cooley in *People v. Garbutt*, 17 Mich. 9, 25, said:

"Good character is an important fact with every man; and never more so than when he is put on trial charged with an offense which is rendered improbable in the last degree by a uniform course of life wholly inconsistent with any such crime. There are cases where it becomes a man's sole dependence, and yet may prove sufficient to outweigh evidence of the most positive character. The most clear and convincing cases are sometimes satisfactorily rebutted by it, and a life of unblemished integrity becomes a complete shield of protection against the most skillful web of suspicion and falsehood which conspirators have been able to weave. Good character may not only raise a doubt of

guilt which would not otherwise exist, but it may bring conviction of innocence."

He also in the same case said:

"The difficulty at this point lies in attempting to surround the jury with arbitrary rules as to the weight they shall allow to evidence which has properly been placed before them. This court has several times found it necessary to declare that no such arbitrary rules are admissible. We refer particularly to the cases of *People v. Jenness,* 5 Mich. 305; *Maher v. People,* 10 Mich. 212, and *Durant v. People,* 13 Mich. 351. The trial of criminal cases is by a jury of the country, and not by the court. The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common sense view of a set of circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be. This is the theory of the law; and as applied to criminal accusations, it is eminently wise, and favorable alike to liberty and to justice. But to give it full effect, the jury must be left to weigh the evidence and to examine the alleged motives by their own tests."

The whole matter is for the jury to determine. The question being discussed is whether the matter was properly left to the jury. The proposition contained in the requested instruction is undoubtedly true. Good character has, and ought to have, great weight. The other evidence in the case may be sufficient to convict a person of bad character, when it would be wholly insufficient if good character were shown. But the same is true of other substantive matters of defense. Must the court single out each substantive fact in the evidence that tends to establish innocence, and tell the jury that if a consideration of all other evidence would require a verdict of

guilty, they must still consider whether the particular fact pointed out would not be sufficient to raise a reasonable doubt? The attention of the jury was directly called to the character of the defendant by the court, and they were told that evidence of good character was allowed as tending to show that she would not be likely to commit the crime charged against her, and that it was to be considered with all of the other evidence in the case and to be given such weight as the jury may deem it entitled to. There is nothing in the record to show that the jury did not give due weight to this evidence. We cannot say that there was error in this ruling of the court.

11. The defendant did not testify in her own behalf. An instruction based upon that fact was given to the jury copied from the instruction approved by this court in *Lamb v. State*, 69 Neb. 212, and we are asked now to say that it is erroneous. We are satisfied with the language there used and with the conclusion reached.

12. The court instructed the jury:

"You are further instructed that it is not indispensable that a motive be shown for the commission of a crime, but the existence or non-existence of such motive is a question of fact which must be determined by the jury from a consideration of all of the evidence in the case, and as a circumstance tending to show the guilt or innocence of the accused."

It is urged that this instruction is wrong because crime is not committed without some motive. But the instruction does not say that it is not indispensable that a motive exist. The human mind is sometimes unfathomable. A motive may exist, and there still be no direct evidence to show it. If, in fact, the crime was committed, and this is shown beyond a reasonable doubt, then it does not necessarily follow that no motive existed, because the evidence fails to show an adequate motive. It is therefore not erroneous to tell the jury that it is not indispensable that a motive be shown.

13. An instruction was given attempting to define what

is meant by the expression "a reasonable doubt." With the exception of one sentence, it was given to the jury in *Barney v. State,* 49 Neb. 515. The instruction here complained of contained the words:

"You are not at liberty to disbelieve as jurors if from all the evidence you believe as men."

These words were not included in the instruction quoted in *Barney v. State,* otherwise the instruction was practically the same in both cases.

This court refused to reverse the judgment in the case of *Barney v. State* on account of this instruction; but did not unqualifiedly approve of giving such language in the charge to the jury. The court said: "Whenever a court undertakes to define a reasonable doubt, it opens the way to a vast amount of speculative reasoning without any very practical application." The instruction may be deserving of some of the criticism it has provoked, but in view of the former decision of this court, we cannot reverse this judgment solely on account of the giving of this instruction.

14. The evidence relied upon to establish the guilt of the defendant is circumstantial. In such cases the facts proved beyond a reasonable doubt must be such as to exclude every reasonable hypothesis inconsistent with the guilt of the defendant. It is earnestly contended that the evidence in this case does not meet this requirement. We cannot in this opinion reproduce this large mass of testimony, nor even set forth the substance of the evidence of the various witnesses. Some of the facts immediately surrounding the transaction of the murder are as follows: The defendant and her husband had for many years resided together as husband and wife in the community where the crime was committed. They appear to have lived happily together. There is much evidence in the record to that effect, and none to the contrary. The defendant had always borne a good character and reputation in the community where she lived, and is entitled to the presumption of innocence that always arises from a cor

rect and blameless life. She was engaged in dressmaking and appears to have been generally active and diligent in her undertakings, but there is nothing established showing avarice or that she was a "greedy, grasping woman." That night as usual they occupied the chamber by themselves. It was not a large room. There was a window opening to the east which was not far from the south side of the room. The bed was immediately in front of this window. The south end of the bed, where their heads rested, was about ten inches from the wall in which this window was located, while the foot of the bed was at a greater distance, undoubtedly about twenty-two inches, as disclosed by the evidence.

Mr. Lillie occupied the side of the bed farthest from the window and there can be no doubt, under the evidence, that when his position was first observed after the murder, the body was lying upon the back. There is some conflict in the evidence as to the exact position of the head, which will be again noticed. The defendant occupied the part of the bed nearest the window. These details and others that will be noticed later, are very important in determining two questions: First, Was the fatal shot fired from the east side of the bed? Second, If it was fired from the east side of the bed, could it have been done by any other person than the defendant herself? The bullet entered Mr. Lillie's head upon the right side, a little above the ear and somewhat further forward than the center of the head. Upon this point there is no conflict in the evidence. There was a post-mortem examination made by several surgeons, and their evidence was taken as to the course of the bullet through the head. The bullet passed through the brain, struck the skull on the opposite side of the head, failed to penetrate it, and was found near where it had struck the skull. Verbal descriptions of the course of the bullet indicate that the line of its passage through the brain was nearly perpendicular with the side of the head. A human skull was in evidence which was marked by the expert witnesses to indicate the point where

the bullet entered the skull of the deceased and also the point where the bullet struck the skull on the opposite side of the head.   The witnesses substantially agreed that these marks upon the skull in evidence correctly indicated the course of the bullet.   From this evidence it appears that the line of the bullet's course was not at a right angle with the side of the head, but that the bullet took a downward and backward course so that the point at which it struck the skull on the opposite side of the head was about two inches lower and about the same distance farther toward the back of the head than the point where the bullet entered.   In connection with this circumstance, it is urged by counsel that when the body of the deceased was first observed, after the crime was committed, the head was turned to the west so that it rested upon the left side of the face; and that therefore the bullet might have been fired from the west side of the bed.   This would agree with the statements of the defendant, who, immediately after the crime was committed, declared that Mr. Lillie was shot by a burglar from the west side of the bed; that she was awakened by this shot and saw the burglar with a revolver in his hand which was pointed at herself, and that the burglar approached her, and, to avoid being shot, she threw herself from the bed, so that the second shot, which was fired almost at the same time, passed over her and through the window before mentioned.

As to the position of the head of the deceased when first observed after the crime was committed, the evidence is not entirely satisfactory.   Evidence upon this point becomes of greater importance because it is established beyond controversy by the expert testimony produced upon the trial that the effect of such a wound, through that part of the brain traversed by this bullet, would be to immediately take away all power of voluntary motion, so much so as to render it impossible that the deceased might have changed his position after the fatal shot was fired.

The defendant's little girl 12 years of age appears to have been the first witness who observed the position of the

body. She seems to have gone into the room immediately. She says she tried to wake him up; that she took him by the ear, that it was his right ear that she took hold of. From the situation of the bed in the room, and the location of the door through which this child must have entered, as well as the location of the body upon the bed, she must have gone to the west side of the bed, and if she is correct in saying that she took hold of his right ear, the head must have been turned to at least a considerable degree toward the west.

Mr. Bert Hall, who appears to have been the next witness who saw the body, testified that the face was turned distinctly toward the west, and when further questioned as to the matter said that it was turned at least eighty degrees toward the west. By this he afterwards explained that he meant that it was turned at least four-fifths, and his evidence fairly construed is that the head was lying very nearly flat upon the left side of the face. He seems for some reason to have been very much confused, or, as he said, "nervous," and stated that he had testified a little differently he thought at a former examination, but that he was more confused then than he was afterwards.

Dr. Stewart, who first saw the body and afterwards changed the position of the head, was not called as a witness. The state refused to put him upon the witness stand at the request of the defendant. There were other witnesses whose evidence tends to show that the head was turned but very little, if any, and the face was directly toward the ceiling. It does not appear from the evidence whether these witnesses saw the body before the head had been moved by Dr. Stewart, or not until afterwards. There were several features of this evidence which rendered it a difficult task for the jury to determine the exact fact upon this question. The position of the head, when the shot was fired, may have been with the face turned somewhat toward the west from an upward position.

If the jury accepted the evidence of the witness Hall, and considered the course of the bullet through the head, it would lead to the conclusion that the weapon was held in a position directly over the head of the deceased. The shot then was fired either from that position, or from a position more to the eastward and, if the latter, the person who held the weapon must have been at the east of the bed at the time.

Another circumstance is worthy of mention in this connection. As before noticed the second shot was fired through the window. They were, of course, both fired by the same person. The bullet passed first through the curtain, then the window-pane, then an ordinary wire screen. It is beyond question from an inspection of these exhibits that the bullet in passing out of the window did not take a downward course. The evidence shows that the range of the bullet was such that if it had been fired from the west side of the bed, it must have passed within a few inches of the pillow upon which the head of the deceased rested. The weapon when the second shot was fired must then have been not more than six inches higher than Mr. Lillie's head. There was evidence from which the jury might reasonably believe that the weapon must have been much nearer the curtain to have powder-burned it as this curtain was. The circumstances seem to justify the jury in finding that the supposition that Mr. Lillie was shot from the west side of the bed was not a reasonable one. They are not, however, inconsistent with the view that the bullet came from the east. If the jury found, as it was not unreasonable to do from this evidence, that Mr. Lillie's face was turned but a few degrees to the west when he was shot, they must necessarily have found that he was shot from the east. We are driven to the conclusion that a finding that beyond all reasonable doubt Mr. Lillie was shot by some person who was then between him and the window in question cannot be held to be unsupported by this evidence. If the jury believed that this was the case, the conclusion that this defendant

and no other person did the shooting seems also to be justified. The space between the bed and the window was very narrow. The course of the bullet was downward from the top of the head. The person who did the shooting must have been at least far enough to the south to be between Mr. Lillie's head and the window. If he had shot Mr. Lillie from that position, it would have been impossible that the second bullet shot at Mrs. Lillie and missing her, should have passed out of the window, as she says the bullet so fired did.

The defendant on the afternoon before the murder stated to the girls in the house that she had a large sum of money and would go and deposit it in the bank; that she feared burglars might break into the house and the money be stolen. Also immediately after the murder, she in the presence of several persons opened a bureau drawer in the room, and thereupon stated that her money was gone, and that she had about three hundred dollars in the drawer.

No attempt was made upon the trial to support these statements with proof that the defendant was in possession of any such sum of money. On the contrary it was shown that after making the above statements to the girls in the house, she was at the bank and paid a small amount on a note of hers and she made no deposit in the bank. This, as her counsel say, was because she did not at that time have an account with this particular bank with which she made a payment upon her note. The defendant also immediately after the murder, in the presence of the same witnesses, examined the clothing of Mr. Lillie and declared that his pocket-book had been taken and his money was gone. There was no proof offered on the trial tending to show that any pocket-book or money of Mr. Lillie's was missing after the murder.

It appears that the defendant, immediately after the second shot was fired, after having by her screams alarmed some of the girls who were sleeping in bedrooms immediately across the narrow hall, went downstairs with all of

Lillie v. State.

the girls, who immediately went to a neighbor's house to call assistance, leaving the defendant alone in the house with the murdered man. She afterwards stated that she found the kitchen door open, the key having been dislodged from the lock and lying upon the floor, and that the burglar after the shooting ran downstairs. The evidence showed that this kitchen door was locked when the family retired that night, and there was also evidence tending to show that the keyhole on the outside of the door was seen the next morning to be filled with cobwebs and dirt, indicating that the door, if it had been unlocked in the night, was unlocked from the inside rather than the outside.

15. There was no evidence before the jury that the defendant possessed or had access to a weapon with which to commit the crime, and although the house was searched after the murder and no such weapon was found, still, in view of the opportunity that the defendant had for concealing such weapon, these facts, though entitled to careful consideration, are not so conclusive as to overthrow the evidence of guilt.

The duty of determining whether or not a fellow being has been guilty of so cold-blooded and unnatural a crime imposes a terrible responsibility. A wise provision of our law requires the judgment of twelve men upon such questions. Every reasonable precaution is required to guard against an unjust conviction. It is the duty of the courts to see that these are observed. If all of the rights of the accused have been protected, if upon the whole evidence the minds of reasonable men might differ as to whether there is reasonable doubt of guilt, the conclusion of the tribunal to which the law commits the responsibility must be taken as just. The wisdom of the past tells us that thus we have greatest assurance of avoiding the mistaken judgments to which the frailties of human reasoning sometimes lead. We conclude that the law does not require nor allow us to interfere with this verdict.

The judgment of the district court is therefore

AFFIRMED.