ETHEL R. FALKINBURG, APPELLEE, V. PRUDENTIAL INSURANCE COMPANY OF AMERICA, APPELLANT.

273 N. W. 478

FILED MAY 21, 1937.   No. 29903.

832

*Young & Williams,* for appellant.

*Brome & Thomas* and *Harold A. Moore, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

DAY, J.

The beneficiary of a life insurance policy recovered a judgment. The defense was suicide. The policy was issued January 11, 1934, and the insured died February 28, 1935. The policy provided: "If within two years from the date hereof the insured, whether sane or insane, should die by suicide, the liability of the company shall not exceed the amount of the premiums paid on this policy." The sole issue is whether the gunshot wound which caused death was intentionally or accidentally inflicted. The insured was alone in a bedroom of his home when shot.

The trial court excluded the testimony of two physicians who examined the insured prior to the time when he was

shot. The purpose of this testimony was to show his physical and mental condition on August 3, October 26, and December 10, 1934. The insurance company offered to prove by one, a specialist in mental and nervous diseases, that there were indications of brain tumor and mental deterioration. The other specialist found on December 10, 1934, that the insured was apprehensive, worried, easily excited, and nervous; that he was suffering from a manic-depressive psychosis, a form of melancholia, accompanied by an agitated mental state in which the patient worries much, exhibits fear and loses his sense of proportion; and that the condition was permanent and progressive.

The trial court was of the opinion that under the terms of the policy the mental condition of the insured was not an issue. That conclusion was correct in that if the insured died by suicide recovery could not be had regardless of his mental condition. But the trial court overlooked another purpose for which such testimony was admissible. There were no eyewitnesses to the shooting, so the evidence was entirely circumstantial. The insured had been a Pullman conductor for 24 years. In July, 1934, he was unable to continue his work on account of illness described as a nervous, worn-out condition. He made a few trips thereafter, but did not work after October 18, 1934. During the forenoon of February 20, 1935, he washed windows and helped his wife clean the house until noon. He was then to go to the grocery store for food. While his wife was in the bathroom, he went into a bedroom where he was shot in the region of the heart by a bullet from a revolver which he kept in a chiffonier in that room.

There is no direct evidence supporting the defendant's allegation of suicide. In such a case a noted authority states the rule thus: "Where circumstantial evidence is the only evidence available to a party, and the action must be determined upon the relative strength of probabilities and inferences, great latitude is allowed the parties in the adduction and admission of evidence." 2 Jones, Commentaries on Evidence (2d ed.) sec. 604. The more the jury

can know of the surrounding facts and circumstances, the better their judgment is likely to be. The physical and mental health of the insured is a surrounding circumstance which is relevant in this case, and the testimony on this matter was unduly restricted.

In an action on a life insurance policy which excludes liability for death by suicide, where the allegation of suicide is supported solely by circumstantial evidence, testimony as to the prior physical and mental health of the insured is relevant and admissible. The reason of the rule here announced is supported by *Bowers v. Pixley,* 111 Neb. 698, 197 N. W. 410. In that case it was held that, where there is a conflict in the evidence, any collateral fact or circumstance tending in any reasonable degree to establish the probability or improbability of a fact in issue is relevant evidence. *Shepherd v. Lincoln Traction Co.,* 79 Neb. 834, 113 N. W. 627, is cited and followed. The evidence is not excluded by any rule or principle of law and need not further engage our attention.

But the trial court was of the opinion that the testimony of the two physicians was privileged and therefore not admissible. A communication by a patient to his physician necessary for the performance of professional services is ordinarily privileged by the statute forbidding the disclosure of confidential communications between physician and patient. Comp. St. 1929, sec. 20-1206; *Nichols v. State,* 109 Neb. 335, 191 N. W. 333; *Friesen v. Reimer,* 124 Neb. 620, 247 N. W. 561. But the general rule is not applicable to this case for that the insured waived the privilege by a provision of the contract. The provision is: "I expressly waive, on behalf of myself and of any person who shall have or claim any interest in any policy issued hereunder, all provisions of law forbidding any physician or other person who has attended or examined me, or who may hereafter attend or examine me, from disclosing any knowledge or information thereby acquired, and I hereby expressly authorize such physician or other person to make such disclosures."

Does a waiver by an applicant for an insurance policy remove the disqualification of a physician to testify? It is stated by one well-known authority: "The object of statutes making communications between physician and patient privileged is not absolutely to disqualify the physician from testifying, but to enable the patient to secure medical aid without betrayal of confidence. The patient may therefore waive objection, and permit the physician to testify. In other words, the privilege is the privilege of the patient, and not of the physician; and by the great weight of authority, if the patient assents, the court will compel the physician to answer." 28 R. C. L. 542, sec. 132. A competent annotator states: "Practically all the authorities—with exception of those from two jurisdictions, which are affected by the particular provisions of the statute on the point—recognize that the waiver by an applicant for an insurance policy, either in his application or in the policy itself, of the disqualification of his physician or surgeon to testify concerning confidential communications between them, is valid and binding upon those claiming any interest in the policy." 54 A. L. R. 412. A comprehensive annotation cites and discusses many cases.

The appellee argues that the waiver was not a general one and applied only to the time of the issuance of the policy and not to subsequent examination by and consultation with physicians. *Pride v. Interstate Business Men's Accident Ass'n*, 207 Ia. 167, 216 N. W. 62, is cited to support this contention. The cited case held that a patient could waive his privilege by contract in advance, but that the waiver made by an insured did not apply to future communications. The insurance company in that case called three doctors who were called to attend the insured at the time of his injury and offered to prove by each certain statements made by the insured on the night of the injury concerning the method of the injury, tending to show that it was self-inflicted. A comparison of the waiver set out in the opinion with the one herein discloses that the language is different. The language here is a waiver of

provisions of law forbidding any physician "who may hereafter attend or examine me from disclosing any knowledge or information thereby acquired." The cited case, therefore, is not controlling.

A contractual waiver of the statutory prohibition of the testimony of a physician has been considered twice by this court. In *Bryant v. Modern Woodmen of America,* 86 Neb. 372, 125 N. W. 621, the court held that the contractual waiver was valid, although the question related to the health of the insured at the time of the application. In another case, *Western Travelers Accident Ass'n v. Munson,* 73 Neb. 858, 103 N. W. 688, this court held that a patient could waive the privilege and that "It is not necessary that such waiver be made at the time of the trial, it may be included in and made a part of the contract sought to be enforced in the action in which such testimony is offered." The physician testified in that case as to the cause of death, which information came to him in his professional capacity. The contract was held to waive any prohibition against such a disclosure.

The citation of the many cases would unduly prolong this opinion. The circumstances in many differ from those in the case at bar. It should suffice to state that the waiver of the statutory prohibition in this case was so broad and unrestricted that the disclosure was proper, and the exclusion of the testimony was erroneous and prejudicial to the defendant.

Certain assignments of error relate to the testimony of ballistic experts. The court excluded the testimony of such an expert that, after scraping off old corrosion and exposing bright, fresh metal, corrosion will be uniform. This evidence was offered as tending to prove that the fired shell causing death and a misfired shell in the gun were indented the same day. This was not prejudicial since the expert testified that he could not say that they were fired the same day and that there might be as much as four months' variation.

The court also refused to admit two exhibits to illustrate

the testimony of an expert. One was a model of the gun which killed the insured, intended to demonstrate the mechanism and working of the gun. The other exhibit was a chart prepared by a witness showing the mechanical construction of the same gun. Models and diagrams made for the purpose of speaking for the witness depend upon the verity of the testimony behind them.

The rule is stated in 2 Wigmore, Evidence (2d ed.) 90, as follows: "Whenever such a document is offered as proving a thing to be as therein represented, then it is offered testimonially, and it must be associated with a testifier." This text quotes from *State v. Knight*, 43 Me. 11, 132, as follows: "It would be very difficult for an expert of the most accurate and extensive observation, to exhibit in language with precision, so as to be understood, those delicate appearances which are appreciable only by the sense of vision. Nothing short of an exact representation to the sight can give with certainty, a perfectly correct idea to the mind."

The model and diagram illustrate the testimony of the witnesses in this case and serve as a nonverbal method of expressing the testimony of the witness. It is proper and customary for the trial court in its discretion to admit such exhibits in evidence. "It would be folly," states 2 Wigmore, Evidence (2d ed.) 89, "to deny ourselves on the witness-stand those effective media of communication commonly employed at other times as a superior substitute for words." See, also, 22 C. J. 768, and 3 Jones, Commentaries on Evidence (2d ed.) 2575. There is no apparent reason for the exclusion of the exhibits.

But in this particular case it was not an abuse of discretion for the trial judge to exclude such exhibits. It was not prejudicial to the rights of the defendant because the witnesses testified in detail as to the mechanism and operation of the gun in question and illustrated such testimony by frequent reference to the exhibits in the presence of the jury.

There was a fired shell and a misfired shell in the death

gun which was fully loaded at the time. It was the contention of the defendant that the misfired shell was the result of an attempted shot at the same time as the fired shell was discharged. Two experts testified as to experiments with the death gun, each firing ten test shells for the purpose of testifying as to the method of discharge—whether the gun was fired single action by cocking or double action by pulling the trigger.

As a part of the testimony of the defendant's expert, the test shells were introduced in evidence. The trial court excluded these exhibits. In *Lillie v. State*, 72 Neb. 228, 100 N. W. 316, it was held: "Under some circumstances it is in the discretion of the trial court to permit evidence of experiments to illustrate transactions that have been testified to; and, under the circumstances in this case, the court did not abuse its discretion in permitting such evidence." For a discussion of experimental evidence, see annotation in 8 A. L. R. 18.

In the case at bar, the evidence as to the experiments was admitted by the trial court. The test shells were used as illustrative of the testimony of the expert, but when they were offered in evidence they were excluded. These exhibits were not unlike the models and diagrams heretofore discussed in this opinion. It is clearly within the discretion of the trial judge to receive in evidence test shells used in experimentation relevant to some issue in the case. Ordinarily, the discretion of the trial judge in excluding exhibits of tests made by an expert will not be interfered with by this court on appeal unless there is an abuse of such discretion.

However, in this case the ballistic expert testifying for the plaintiff made similar experiments and testified as to such experiments as evidence upon the identical issue; that is, the method of firing the gun. In fairness to the trial judge, it appears from the record that he was mistakenly of the notion that the test shells of the defendant's expert had been introduced as evidence upon a different issue. While it is within the discretion of the trial

judge to exclude such exhibits, it would seem as a matter of fair play to be an abuse of discretion on the part of the trial judge to receive such exhibits as evidence for one party and exclude like exhibits for the other party. It would seem that the trial judge might have excluded or received both sets of test shells. Therefore, in the condition of the record, the trial court erred in excluding as exhibits the test shells fired by the expert ballistic witness who testified for the defendant.

The trial court instructed the jury: "You are instructed that the law presumes that the insured did not intentionally take his own life, and this presumption obtains until you find from a preponderance of all the evidence that the insured Orville G. Falkinburg did take his own life."

That part of the instruction—"and this presumption obtains until you find from a preponderance of all the evidence that the insured * * * did take his own life"—is criticized by the appellant. There may be some inaccuracy of expression in the instruction as a scientific statement of the law. However, an academic discussion of the law of presumptions and their effect is not required by the exigencies of this case. It would seem better for the purpose of this case to use our former opinions as yardsticks to measure the accuracy of the rule stated in the instruction. In *Grosvenor v. Fidelity & Casualty Co.*, 102 Neb. 629, 168 N. W. 596, it was held: "The presumption against death by suicide is *prima facie* only and rebuttable. It prevails when the cause of death is unknown. It does not prevail as a presumption in the presence of facts bearing upon the question whether death is intentional or accidental." This follows the general rule that a presumption disappears in the presence of evidence. In the last cited opinion the rule is further elucidated as follows: "When evidence is adduced which is contrary to such presumption, or the presumption is met by conflicting presumptions, it disappears, although the fact upon which it rests may still remain, proper to be considered in arriving at a conclusion." Considered with these authoritative statements of the law, the

language of the instruction appears to be inaccurate. But was the instruction prejudicial?

The law in Nebraska is: "In an action upon a policy of life insurance, the burden of proof is upon the defendant to prove by a preponderance of the evidence a controverted defense that the assured died as the result of poison, self-administered with suicidal intent." *Schrader v. Modern Brotherhood of America*, 90 Neb. 683, 134 N. W. 267.

While it may be inaccurate to say that the presumption against suicide obtains until you find from a preponderance of all the evidence that the insured did take his own life, nevertheless the defendant could not prevail in the case until it established by a preponderance of the evidence that the insured died by suicide. Certainly, when testimony is offered to rebut the presumption that death did not result from suicide, the presumption disappears, and the case is then to be determined upon the evidence. But before the defendant can prevail, it must establish by a preponderance of the evidence that death resulted from suicide. The instruction did not increase the quantum of proof required to establish the defense. The instruction is criticized and ought not to be given by trial judges in such form, but it is not prejudicial in this case. No judgment will be reversed by the supreme court on account of an error which does not affect a substantial right of the appellant. Comp. St. 1929, sec. 20-853.

Another assignment of error which is briefly considered, since this case must be remanded for a new trial, relates to the testimony as to the statement of the insured that the "gun went off" and that "it was an accident." These conversations with the insured took place within a few minutes of the time the shot was fired. The insured was wounded in such a way that he died eight days later. The witness who testified to this statement was a neighbor called immediately by the wife. Statements of the insured, immediately following discovery after being shot, relative to circumstances are admissible as a part of the *res gestæ*. *Ridenour v. Lewis*, 121 Neb. 823, 238 N. W. 745; *Roh v. Opocensky*, 126 Neb. 518, 253 N. W. 680.

The judgment is reversed for the prejudicial errors occurring at the trial and the cause is remanded.

REVERSED.