ALMA WILLIS, APPELLANT, V. ORDER OF RAILROAD TELEGRAPHERS ET AL., APPELLEES.

296 N. W. 443

FILED FEBRUARY 14, 1941.   No. 30948.

*Everett C. Pilcher,* for appellant.

*Crossman & Barton* and *Edward A. Nelson, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

PAINE, J.

Suit was brought by the widow and beneficiary upon a fraternal benefit department insurance policy carried by her husband. The defendant paid $1,000, which plaintiff accepted, to apply upon the policy, and plaintiff brought suit for the remaining $2,000. At the close of the evidence, the trial judge, upon motion of defendant, took the case from the jury and dismissed the action. Plaintiff appeals.

An amended petition was filed in the district court, alleging that the plaintiff was the widow of LeRoy F. Willis, who was a telegrapher for the Burlington railroad at Omaha, and who was a member of the Order of Railroad Telegraphers, which order conducted a mutual benefit department, from which in 1911 deceased secured a $1,000 life insurance policy. In September, 1936, a new policy was issued to him in the sum of $3,000 in the legal reserve class, and all premiums were paid thereon. LeRoy F. Willis died March 28, 1938, and due notice and proof of death were given to the defendant, and on June 9, 1938, the defendant mailed the plaintiff a draft for $1,000, and refused to pay the balance of $2,000 upon said policy. Because of such refusal to pay the balance, the plaintiff asked for judgment in the sum of $2,000 and interest, together with a reasonable attorney's fee.

The defendant admits in its answer the death of the insured, and that proof of death was duly made, and $1,000 paid thereon. Defendant alleges that it is an incorporated fraternal beneficiary association, with its principal office and place of business in St. Louis, Missouri, and admits to membership only persons engaged in the occupation of railroad telegrapher, which occupation is a hazardous occupation, and that the Order of Railroad Telegraphers has maintained a mutual benefit department for the issuance of certificates or policies of life insurance. Defendant further alleges that on August 14, 1911, it issued to the deceased a "Current Cost Class" certificate for $1,000 life insurance, the same being issued upon a nonmedical application as to insurability; that on August 11, 1936, the deceased, being then a member of the Order of Railroad Telegraphers, signed an application to transfer the policy of $1,000, which he had carried for 25 years, into $1,000 of insurance in the "Legal Reserve Class," and applied for an increase of $2,000 additional in that class, and submitted his written nonmedical application to the defendant for such additional amount of such insurance in the amount of $2,000, making a total policy of $3,000.

One of the provisions of the nonmedical application stated that he warranted the foregoing answers and statements as full, true and correct, and agreed that the answers and statements should be held to be warranties, and he agreed to be bound by the constitution and laws of the Mutual Benefit Department of the Order of Railroad Telegraphers then in force, or as the same might be amended or enacted, without reservation or exception. He further agreed to waive, both for himself and his beneficiary, all legal objections to allowing any physician or surgeon consulted by him at any time to testify in any matter involving his contract and the policy of insurance issued, and finally, in consideration of the issuance of the policy, he made the statement, "I warrant that I am now in sound physical and mental condition of health."

The defendant alleges that the conversion of the original $1,000 certificate did not depend upon the insurability of the insured, but was a right which he had without medical examination, but that the issuance of any additional amount of insurance in the legal reserve class was dependent upon his insurability therefor; that in his application for such additional insurance he answered that the only medical or surgical advice or attention which he had received in the last ten years was for pneumonia in the month of December, 1932; that its duration was four months; that there were no complications; that no operation was performed, and the result was a complete recovery. In addition, he stated, in answer to other questions, that he had had no other illness, and that he was in good health at that time, and that he had set forth all of his past ailments and physical impairments, and that, relying upon these answers, the defendant issued and delivered to the deceased a $3,000 legal reserve policy. Article 18 of the laws of the defendant at the time of the application provided that false or fraudulent statements made to procure the issuance of a policy should be sufficient cause for the revocation of the certificate or policy.

Defendant further alleges that, upon the submission of

the proof of death by plaintiff to defendant on April 5, 1938, it was ascertained by the defendant that the deceased had been attended by a physician other than Dr. H. J. Jenkins, as stated in his application, and that the deceased had not had a complete recovery from pneumonia in 1932, and that he had submitted to an operation on the wall of his chest on January 17, 1933, for the draining of the pus from his left lung, and never had completely recovered from the attack of pneumonia; further, that from July, 1935, the insured had hematuria, or intermittent bleeding in his urine, attributable to his left kidney, and that there was a malignant tumor, or cancer, in said left kidney, which was removed October 6, 1937, and by reason of which he died March 28, 1938.

Defendant charges that, at the time of the application and the warranties made by the insured, he was not then in good health, as warranted by him; that he did not set forth all of his past ailments and physical impairments, as warranted by him, and that the express, false and untrue warranties were material to the risk, and directly affected the insurability of the insured, and that said warranties were relied upon and acted upon by the defendant, when, if the true facts had been known, defendant would have refused to issue the policy for an additional $2,000.

The defendant further alleges that, upon ascertaining the facts, it tendered to the plaintiff its check in the amount of $174.72, representing the full amount of the two premiums paid by the deceased for the $2,000 additional insurance; that the plaintiff returned said check, but the defendant has kept its tender good, and deposited said amount with the clerk of the court at the time of filing its answer, and prays that the petition be dismissed.

The plaintiff for a reply specifically denies any fraud or misrepresentation on the part of the deceased, and that he had no knowledge of any incorrect statement, and charges that the insurance contract was inseparable and indivisible, and that the defendant admitted liability by paying $1,000 to apply on the $3,000 contract, and is estopped to deny liability for the remainder of said contract.

A jury being duly impaneled, trial was had, and at the conclusion of all the evidence the court sustained a motion of the defendant for a directed verdict and dismissed the plaintiff's action, and .directed that the deposit with the clerk of the refund premiums in the amount of $174.72 be first applied to the payment of the defendant's costs and the balance paid to the plaintiff.

Plaintiff in her motion for a new trial sets out 14 errors, covering many rulings upon the admission and rejection of testimony; that the judgment entered is not sustained by sufficient evidence, is contrary to law, and because of newly discovered evidence.

In the brief, specific errors relied upon for a reversal cover the admission of evidence of Dr. Charles McMartin relative to conversations with the insured pertaining to his physical condition prior to his application, which conversations were not in the presence of the plaintiff, and she insists that such testimony was incompetent, irrelevant and immaterial, and was privileged testimony, and it was prejudicial error to permit Dr. McMartin to testify as to how long the cancerous tumor had existed, there being no sufficient foundation laid therefor, and also the testimony of Dr. Isaiah Lukens relative to his opinion as to how long the tumor had existed in the kidney.

We will therefore first consider the testimony of Dr. Charles McMartin, whose deposition was taken by the defendant, and who said that he practiced for two years in Chicago, and then 32 years in Omaha; that he was a specialist in genito-urinary diseases.

At the beginning of Dr. McMartin's testimony, the plaintiff objected to any testimony in reference to examinations made of the insured, or information gained, on the ground that it was a confidential communication, entrusted to him in his professional capacity, and was privileged under section 20-1206, Comp. St. 1929. The trial court called attention to the fact that, attached to the application for this insurance, signed by the deceased on August 11, 1936, there was a waiver of the insured, addressed to any physician or

surgeon, and asking them to furnish to the defendant upon request all information they may have as to the diagnosis, treatment and prognosis of any condition for which they may have prescribed for insured, etc., and by reason of that waiver the objection was overruled. In our judgment this ruling was correct.

Statements made to a surgeon for the purpose of receiving treatment are competent when they were necessary to an examination before treatment. 8 R. C. L. 639, sec. 181; *Cleveland, C. C. & I. R. Co. v. Newell,* 104 Ind. 264, 3 N. E. 836, 54 Am. Rep. 312. These are exceptions to the hearsay rule. 67 A. L. R. 11, Ann.; *Falkinburg v. Prudential Ins. Co.,* 132 Neb. 831, 273 N. W. 478.

Dr. McMartin testified that he was called to see the insured by Dr. H. J. Jenkins, and attended him in the hospital on September 27, 1937, and found a large palpable mass over the region of the left kidney, of the size of a large grapefruit, which was sensitive to the touch. Two days later he made a cystoscopic examination. He explained that the cystoscope was an electrical instrument for looking into the bladder, and then introducing small catheters up to each kidney. He testified that the urine that was coming down from the left kidney was bloody, while that coming down from the right kidney was clear. On October 6, 1937, Dr. McMartin performed an operation for the removal of the left kidney, and on October 19 the insured left the hospital. Dr. McMartin testified that, in taking the history of the case from the insured, he said that he had had blood in his urine intermittently for two years prior to that time. Dr. McMartin testified that this blood in the urine was the first symptom of the cancer in the left kidney, which had been there for at least that period of time.

Dr. H. J. Jenkins, his family physician, testified on direct examination to many office calls and check-ups of the insured, beginning in February, 1936, the calls that year being in February, April, July, October, and November, and testified to other calls in the following years, and when he noticed that there was quite a bit of blood in the urine of

the insured he gave some kind of a blood coagulant, either in a pill or a liquid.

On cross-examination Dr. Jenkins testified that the insured was in the habit of coming to him for a preliminary check-up prior to going down for the periodic examination by Dr. Parks, the railroad physician.

Now, it is insisted by the plaintiff that such statements made by the insured relative to his condition, not made in the presence of the plaintiff, are hearsay and privileged, and are not binding upon her. However, we find in the proof of death, signed by the plaintiff on April 5, 1938, question 9, "Do you authorize physicians and hospitals to make statements concerning the deceased's condition?" and her answer is "Yes." In our opinion, this is a definite waiver by the plaintiff of the introduction of such evidence, and this, taken in connection with the waiver of the insured attached to his application, renders this objection of the plaintiff unavailing. *Wolski v. National Life & Accident Ins. Co.*, 135 Neb. 643, 283 N. W. 381; 54 A. L. R. 412, Ann.

We will now consider the question of the warranties made by the insured as to his good health.

It was claimed by the plaintiff that the application which contained these statements was not attached to or made a part of the policy, but this is not required in policies issued by fraternal associations without medical examination.

Exhibit No. 2 was the nonmedical application for an additional $2,000 of insurance on the whole life plan, applied for on August 11, 1936, in which it was stated that the only disease he had had within ten years was pneumonia in 1932, and that no operation was performed, although it is proved by oral testimony and the hospital records that the operation of thoracotomy was performed over the ninth rib on January 17, 1933, which drained out the pus which had collected in the lung cavity. It is also stated, in his answer No. 21, that he was last examined by a physician in 1935, being the regular railroad examination by Dr. A. L. Parks at the Burlington headquarters in Omaha, and answer

No. 22 was "Yes" to the question, "Are you now in good health?" Above the signature of the deceased to this application is this statement: "I further agree that this application shall be considered a part of my policy of insurance, and that I will be bound by and governed in all respects by the Constitution, Statutes, and Laws of the Mutual Benefit Department of The Order of Railroad Telegraphers now in force or as the same may be hereafter amended or enacted, without reservation or exception. I further agree to and do waive both for myself and for my beneficiary, all legal objections to allowing any physician, surgeon or practitioner of any school consulted by me at any time to testify in any matter involving the Mutual Benefit Department of The Order of Railroad Telegraphers or my contract with it upon which a policy of insurance may be issued. *As a further consideration of the acceptance of this policy and the issuance of a policy of insurance to me, I warrant that I am now in sound physical and mental condition of health.*"

It has been held in many cases that the burden of proving that the insured was not in sound health at the time of the issuance of the policy is upon the defendant. *Aetna Life Ins. Co. v. Rehlaender,* 68 Neb. 284, 94 N. W. 129; *Pollard v. Royal Highlanders,* 128 Neb. 790, 260 N. W. 399; *Weddle v. Prudential Ins. Co.,* 130 Neb. 744, 266 N. W. 624.

In the case of *Gugelman v. Kansas City Life Ins. Co.,* 137 Neb. 411, 289 N. W. 842, this court said: "Good health is a generic expression, resting mostly in opinion. See *Hinnenkamp v. Metropolitan Life Ins. Co.,* 134 Neb. 846, 858, 279 N. W. 784. Good health 'is a comparative term, and means that the insured has no important or serious disease; in other words, that he is free from any ailment that seriously affects the general soundness or healthfulness of the system, as distinguished from mere temporary indisposition, which does not tend to weaken or undermine the constitution, though existing at the time.' 1 Couch, Cyclopedia of Insurance Law, 244, sec. 130. See, also, 37 C. J. 402."

In *Pickens v. Security Benefit Ass'n,* 117 Kan. 475, 231

Pac. 1016, it was held: "Good health in fact was required, and the requirement was not satisfied by appearance of good health or reasonable belief that the member was in good health." See, also, *Van Dahl v. Sovereign Camp, W. O. W.*, 130 Neb. 181, 264 N. W. 454.

It was definitely and positively warranted in the written application of the insured that he was in sound physical condition, and in good health. In our opinion, this was a condition precedent to the issuance of the additional $2,000 of insurance. The warranties being untrue, that portion of the insurance fails.

As to the admission of the hospital records, the courts are in the greatest conflict. In four states, Ohio, Missouri, Texas, and Mississippi, where hospital records are required to be kept by statute, such records are admissible.

In some courts, the official records of a hospital, kept contemporaneously with the matters therein recorded, and in the regular course of business, were admissible in evidence without the assistance of any statute. *Conlon v. John Hancock Mutual Life Ins. Co.*, 56 R. I. 88, 183 Atl. 850.

*Adler v. New York Life Ins. Co.*, 33 Fed. (2d) 827, is a case from the circuit court of appeals of our eighth circuit. The challenged evidence is the record made at the Mayo Clinic, in which the clinical history given by patient was recorded, and the court say this "Mayo record is identified by the physician who made the examination as being 'made at the time under my direction and verified by me.' No record could be more surely identified." It was held sufficiently identified to authorize its admission in suit to cancel policy on patient's life.

Many cases have held that a hospital chart is competent and admissible as to all matters proper for inclusion in a record of such a nature when the proper foundation has been laid. See citations from many states in annotation, 120 A. L. R. 1125.

In the case at bar, under the waiver of the insured in his application, and the special waiver and authorization of the plaintiff in exhibit No. 8 to the St. Joseph's Hospital, and

her authorization in exhibit No. 10 to any physician, hospital, or association to give information in connection with any illness or treatment of the insured, we hold that the admission of the hospital records, limited in their offer to the evidence that was already in the record, was a correct ruling. Without taking the time to discuss many other errors which we find to be harmless, we find that the defendant's motion for a directed verdict and for the dismissal of plaintiff's action was properly sustained.

AFFIRMED.